302 F.3d 76
 UNITED STATES of America, Appellee,
v.
Richard P. SANTORO, also known as Rick, Defendant-Appellant, Michael Ploshnick; Keith Nelson; Scott Shay; Sameh Sherabi, also known as Sam; Daniel McGann; Victor Vega; Edward Cespedes; Joseph Dortona; Franco Dortona; Charles T. Heehler; John Nalick; Meyers Pollock Robbins, Inc., Defendants.
 Docket No. 01-1616.
 United States Court of Appeals, Second Circuit.
 Argued April 2, 2002.
 Decided August 8, 2002.
 
 COPYRIGHT MATERIAL OMITTED Thomas F. Liotti, Garden City, NY, for Defendant-Appellant.
 Celeste L. Koeleveld, Assistant United States Attorney (James B. Comey, United States Attorney for the Southern District of New York, Gary L. Stein, Assistant United States Attorney, on the brief), New York, NY, for Appellee.
 Before: WALKER, Chief Judge, NEWMAN and KEARSE, Circuit Judges.
 JOHN M. WALKER, JR., Chief Judge.
 
 
 1
 Defendant-appellant Richard P. Santoro appeals from the November 28, 2001 judgment of the United States District Court for the Southern District of New York (Loretta A. Preska, District Judge) convicting him, pursuant to a jury verdict, of one count of conspiracy to commit securities fraud, wire fraud, and commercial bribery, in violation of 18 U.S.C. § 371, and two counts of securities fraud by use of manipulative and deceptive devices, in violation of 15 U.S.C. §§ 78j(b), 78ff, 17 C.F.R. 240.10b-5, and 18 U.S.C. § 2. He was sentenced principally to a term of five months of imprisonment, followed by two years of supervised release including five months of home confinement. Santoro is presently serving his sentence.
 
 
 2
 On appeal, Santoro argues that (1) the district court erred at sentencing by applying a two-level abuse of trust enhancement and refusing to apply a minor role reduction; (2) the district court abused its discretion by admitting evidence of his co-conspirators' ties to organized crime; (3) the evidence was insufficient to present the case to the jury; (4) the district court erred by denying Santoro's request for a severance from co-defendant Edward Cespedes; and (5) the Federal Sentencing Guidelines, which mandate a term of imprisonment for his criminal activity, violate the Eighth Amendment prohibition against cruel and unusual punishment.
 
 
 3
 We affirm.
 
 BACKGROUND
 
 4
 Defendant's conviction stems from a conspiracy to artificially inflate the price of the common stock of a publicly held company, HealthTech International, Inc. ("HealthTech"), by giving brokers extraordinary commissions to recommend the stock to their clients. Three stock promoters, Eugene Lombardo, Irwin Schneider and Claudio Iodice (collectively, "stock promoters"), conspired with Gordon Hall, the CEO of HealthTech, to pay brokers employed at the New Hyde Park office of Meyers Pollock Robbins, Inc. ("Meyers Pollock"), a registered broker-dealer firm, to recommend HealthTech stock. Under the agreement, the brokers were assigned a 30% "gross" commission on the sales of HealthTech stock from which the broker received a "net" commission in cash equal to half of that amount. Three brokers at Meyers Pollock, Arnold Schneider, Lawrence Schneider, and Michael Motsykulashvili (collectively, "supervisory brokers"), supervised the other brokers and were responsible for distributing the cash to the brokers.
 
 
 5
 The brokers at Meyers Pollock who carried out the scheme can be divided into two groups. The first group had recently transferred to Meyers Pollock from another securities firm, Toluca Pacific, and were the first to become involved in the scheme ("Toluca Group"). The second group, to which Santoro belonged, acted under the direction of Jonathan Lyons and joined the scheme one week after it began ("Lyons Group").
 
 
 6
 Between January and February 1997, Santoro recommended and sold 20,500 shares of HealthTech stock to five customers for a total of approximately $45,000. Motsykulashvili, one of the supervisory brokers, testified that he discussed the 15% commission with Santoro shortly before Santoro started selling HealthTech stock and that Santoro received cash amounting to 15% of his sales of the stock in exchange for his recommendation. The government also submitted into evidence a spreadsheet that, according to Motsykulashvili, was prepared by the supervisory brokers to keep track of the sales of HealthTech stock and the commissions owed to each broker participating in the scheme. Santoro does not dispute that the spreadsheet identified the brokers that sold HealthTech stock in furtherance of the conspiracy.
 
 
 7
 The spreadsheet indicated that "Rick" made four sales to named customers in January 1997 and, under the heading "Gross," listed dollar amounts for each transaction that equaled approximately 30% of Santoro's sales of HealthTech stock during January to those customers. These figures were added and were represented on the spreadsheet as Rick's "total." These transactions and the customers identified on the spreadsheet matched the records of Santoro's trading activity in HealthTech stock kept by Bear Sterns Clearing Corporation, an independent clearing agent for Meyers Pollock. At the bottom of the spreadsheet, the "totals" for all of the brokers were aggregated and then halved. Motsykulashvili testified that he used the spreadsheet to determine the amount of each broker's commissions. Santoro never disclosed the 15% cash commissions to his clients. Between late 1996 and February 1997, the trading volume and price of HealthTech stock rose dramatically before the fraud was discovered a few months later.
 
 DISCUSSION
 I. Abuse of Trust Enhancement
 
 8
 Section 3B1.3 of the Sentencing Guidelines provides for a two-level enhancement if the defendant "abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. In the case of a fraud conviction, an abuse of trust enhancement may not be imposed on a defendant solely because in committing the fraud, he violated a legal obligation to be truthful. See United States v. Hirsch, 239 F.3d 221, 227 (2d Cir.2001); United States v. Broderson, 67 F.3d 452, 455-56 (2d Cir.1995). Rather, to warrant the enhancement, the defendant must abuse a relationship of trust and confidence with the victim that enabled the defendant to commit the crime or escape detection. See Hirsch, 239 F.3d at 227; United States v. Jolly, 102 F.3d 46, 48 (2d Cir.1996); Broderson, 67 F.3d at 456. A defendant's position in this relationship is characterized by "substantial discretionary judgment that is ordinarily given considerable deference" by the victim. U.S.S.G. § 3B1.3 cmt. 1; see Hirsch, 239 F.3d at 227; United States v. Laljie, 184 F.3d 180, 194 (2d Cir.1999) ("[T]he primary trait that distinguishes a position of trust from other positions is the extent to which the position provides the freedom to commit a difficult-to-detect wrong.") (alteration in original) (internal quotation marks omitted).
 
 
 9
 At sentencing, Santoro argued that he did not occupy a position of trust, relying on evidence that at least two of his clients independently researched HealthTech stock before purchasing it. In addition, Santoro submitted a letter written by one of those clients, Duncan Hoffman, that stated, "I do not believe that Mr. Santoro did anything that I would consider an abuse of trust."
 
 
 10
 The district court rejected defendant's arguments and imposed a two-level enhancement on his sentence pursuant to U.S.S.G. § 3B1.3 based on its finding that the "extraordinary commissions" were Santoro's sole reason for recommending HealthTech stock and that he failed to disclose the commission, despite his duty to his clients. In addition, the district court found that the modus operandi of the conspiracy consisted of first recommending a well-known security to their clients, thereby gaining the clients' trust, before suggesting that they buy HealthTech stock.
 
 
 11
 On appeal, Santoro argues that the enhancement was improper because he lacked discretionary authority to invest his clients' funds and thereby was not his clients' fiduciary. Thus, according to Santoro, he did not occupy a position of trust as defined by § 3B1.3. In addition, he contends that the enhancement is unwarranted because his victims did not subjectively place their trust in him.
 
 
 12
 What constitutes a `position of trust' as defined by the guidelines is a question of law, which we review de novo. See United States v. Hussey, 254 F.3d 428, 431 (2d Cir.2001) (per curiam). We accord "due deference" to the district court's application of the guidelines to the facts, 28 U.S.C. § 3742, and we will not overturn the district court's finding that the defendant abused a position of trust to significantly facilitate his offense unless it is clearly erroneous, see United States v. Hirsch, 239 F.3d 221, 227 (2d Cir.2001). We find that a position of trust exists, even in the absence of a fiduciary relationship, where a defendant-broker affirmatively establishes a trust relationship by recommending a stock to his clients. We agree with the district court that the enhancement is warranted where a broker in such a trust relationship fails to disclose that he is receiving a substantial commission or other payment for the recommendation.
 
 
 13
 We first address Santoro's contention that he did not occupy a position of trust because he lacked discretionary authority to invest his clients' funds. We agree with defendant that there "is no general fiduciary duty inherent in an ordinary broker/customer relationship." Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc., 157 F.3d 933, 940 (2d Cir.1998). However, nothing in the guidelines requires that the position be a fiduciary one. Even where a broker lacks discretionary investment authority, "a relationship of trust and confidence [exists] between a broker and a customer with respect to those matters that have been entrusted to the broker." United States v. Szur, 289 F.3d 200, 211 (2d Cir.2002). As to such matters, a broker has an affirmative duty to disclose all relevant information, including the receipt of excessive commissions. Id.; see also Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 536 (2d Cir.1999). Santoro does not dispute that the 15% commissions paid for the sale of the stock were excessive. The question to be answered then, is this: when making a recommendation to a client, does a broker assume a position of trust and confidence with respect to the recommendation such that his clients would expect him to disclose all material information in his possession that would affect his client's decision regarding the recommended transaction. We easily conclude that he does and that Santoro, in recommending HealthTech, abused the resulting position of trust by withholding information about his excessive commissions and the cause of the unusually dramatic stock performance when recommending HealthTech stock.
 
 
 14
 While Santoro lacked discretionary investment authority, he exercised "substantial discretionary judgment" in choosing stocks to recommend to his clients, thereby assuming a position of trust with respect to those recommendations. Unlike customers who independently find their stocks and whose brokers merely execute trades at their command, customers who rely on investment recommendations reasonably trust their brokers to fully disclose all information pertinent to the recommendation and quality of the investment. A customer relying on a broker's recommendation would want to know information about the broker's receipt of extraordinary commissions in exchange for his recommendation of the stock because, as one of Santoro's clients testified, it would raise a "red flag" that the broker had reason to misrepresent the quality of the investment. Such information is part of the mix of information, including the customers' independent research, if any, that a customer should have to evaluate the quality of the purchase and would tend to undercut the weight given to the broker's recommendation. In addition, information of excessive commissions would enable a customer to infer that other brokers were being offered such commissions and that the price of the stock was thereby being artificially inflated. That Santoro failed to inform his clients that his recommendation was based on the receipt of a significant commission, rather than a fair assessment of the price and quality of the stock, warrants the enhancement.
 
 
 15
 Our holding is further bolstered by the district court's finding that the conspirators were instructed to create a sense of trust by recommending a well-known security before recommending HealthTech stock. Although Santoro contends that he did not personally call his clients with safe securities, at least one of his clients testified that he received such calls from Santoro's co-conspirators. That such a purposeful inculcation of trust was part of the conspiracy makes defendant's claim that he did not occupy a position of trust ring hollow. See Hirsch, 239 F.3d at 228 (finding that development of personal relationships with victims was evidence that defendant occupied a position of trust).
 
 
 16
 Finally, we reject Santoro's contention that § 3B1.3 does not apply because his clients did not subjectively place their trust in him. That some clients purchased the stock after performing independent research is beside the point because, as discussed earlier, they could not properly evaluate the quality of the stock absent knowledge of the extraordinary commissions. In any event, Santoro failed to submit any persuasive evidence that his clients did not in fact view his position as one of trust. Although one customer stated that he did not believe Santoro abused his trust, that customer was not aware that Santoro received the 15% commissions.
 
 
 17
 More importantly, while we have stated that a position of trust must be "viewed from the perspective of the victim," United States v. Hussey, 254 F.3d 428, 431 (2d Cir.2001) (per curiam); United States v. Castagnet, 936 F.2d 57, 62 (2d Cir.1991), nothing in our prior decisions or the Sentencing Guidelines suggests that the victim's subjective beliefs are determinative. See United States v. Bailey, 227 F.3d 792, 802 (7th Cir.2000) (holding that § 3B1.1 requires only that defendant give indicia of holding position of trust, "not that the victim must believe or accept these indicia"); United States v. Shyllon, 10 F.3d 1, 5 (D.C.Cir.1993). Were subjective belief required, sentences would be determined not by the culpability of the defendant, but by the gullibility of the particular victim.
 
 
 18
 In deciding whether to apply the enhancement under § 3B1.1, a court should objectively evaluate whether a reasonable person in the victim's position would view the defendant as occupying a position of trust under the circumstances of the particular case. Thus, in the context of a broker-client relationship, the question turns on whether a reasonable customer, based on his relationship with his broker, would trust the broker to disclose all information in the broker's possession, public and non-public, bearing on the broker's recommended purchase. As we stated earlier, customers who receive investment advice reasonably expect their broker to disclose all relevant information. Thus, Santoro's failure to provide information regarding his commissions and the cause of the artificial inflation of the stock price warranted an enhancement for an abuse of a position of trust.
 
 II. Evidence of Organized Crime
 
 19
 Before trial, the government notified defense counsel that it would introduce evidence that the Toluca Group and Eugene Lombardo, one of the stock promoters, had ties to organized crime. The defendant moved to preclude the evidence, claiming that it would unfairly prejudice the jury against him. The district court rejected Santoro's arguments, finding that any prejudice to Santoro was outweighed by its probative value as a rebuttal to defenses based on alleged lack of criminal knowledge.
 
 
 20
 At trial, the government presented testimony that Lombardo had connections to the Bonanno crime family and that members of organized crime, who were not members of the fraud conspiracy, were brought in to resolve several disputes that threatened the success of the conspiracy. No testimony linked Santoro to organized crime.
 
 
 21
 Santoro argues on appeal that such evidence unduly prejudiced the jury against him because he was the only defendant of Italian descent and because the evidence was irrelevant to proving his knowing participation in the conspiracy. Reviewing this evidentiary ruling for an abuse of discretion, see United States v. McDermott, 245 F.3d 133, 140 (2d Cir. 2001), we affirm.
 
 
 22
 Central to the question of defendants' guilt at trial was not simply their conduct but also their knowledge of the fraud. One defendant in particular, Edward Cespedes, admitted accepting the commissions but asserted in his opening statement and later in his own testimony that he did not know that receipt of commissions was fraudulent. To answer this defense, the government offered proof that Cespedes knew the Toluca Group and Lombardo were connected to organized crime and that Cespedes met with Lombardo on several occasions in furtherance of the conspiracy. There was evidence, for example, that Cespedes accompanied Motsykulashvili to pick up money from Lombardo and that on another occasion, he joined Lombardo and several other brokers in a show of force to persuade Roman Perry, who had previously worked in the New Hyde Park office of Meyers Pollock, to refrain from advising the Toluca Group's clients to sell their HealthTech stock.
 
 
 23
 While association with one who is a criminal is by itself insufficient to establish membership in a criminal conspiracy, such association may, when considered with the totality of the evidence, indicate knowledge sufficient to rebut a claim of ignorance as a defense to criminal conduct. See United States v. Eltayib, 88 F.3d 157, 171-72 (2d Cir.1996). Although the evidence of Lombardo's organized crime ties proved nothing against Santoro, it was relevant to and probative of the government's proof of the conspiracy, and its case against Cespedes in particular, and was properly admitted for those purposes.
 
 
 24
 Moreover, the admission of the evidence did not substantially prejudice Santoro. The references to organized crime were limited and the government never suggested that Santoro was involved with organized crime or sought in any way to counter Santoro's summation making the same point. At any rate, any prejudice that resulted from references to organized crime as part of the government's case against Cespedes could not have adversely affected the outcome of the trial in light of the substantial and convincing evidence against Santoro. See United States v. McDermott, 277 F.3d 240, 243 (2d Cir. 2002). Evidence of Santoro's participation in the conspiracy included Motsykulashvili's testimony that Santoro sold HealthTech shares shortly after the stock promoters proposed the scheme to him and that Santoro directly contacted Motsykulashvili to dispute the amount of one of his payments. This testimony was corroborated by the spreadsheet that listed Santoro as one of the brokers participating in the scheme and his share of the unlawful commissions.
 
 
 25
 We have carefully considered Santoro's remaining arguments and find them to lack merit.
 
 CONCLUSION
 
 26
 For the reasons set forth above, the judgment of the district court is hereby affirmed.