UNITED STATES of America,
Appellee–Cross–Appellant,

v.

Joseph P. THORN, Defendant–
Appellant–Cross–Appellee.

Docket Nos. 03–1602(L), 03–1676(XAP).

United States Court of Appeals,
Second Circuit.

Argued: Oct. 19, 2004.

Decided: April 27, 2006.

Craig A. Benedict, Assistant United States Attorney (Glenn T. Suddaby, United States Attorney for the Northern District of New York, Thomas L. Sansonetti, Assistant Attorney General, on the brief; Elizabeth S. Riker, Assistant United States Attorney, Todd Aagaard, Attorney, United States Department of Justice, of counsel) Syracuse, NY, for Appellee–Cross–Appellant.

Joseph R. Dematteo, DeMatteo Bernfeld, LLP, New York, NY, for Defendant–Appellant–Cross–Appellee.

Before: JACOBS, SOTOMAYOR, and HALL, Circuit Judges.

PETER W. HALL, Circuit Judge.

Following a remand by this Court for resentencing, defendant Joseph P. Thorn appeals and the Government cross-appeals from the Amended Judgment of the United States District Court for the Northern District of New York (Frederick J. Scullin, Jr., *Chief Judge* ) entered September 18, 2003. For the reasons that follow, the modified sentence imposed on remand is affirmed in part, vacated in part, and remanded to the District Court for resentencing.

*Facts and Procedural Background*

The factual and procedural background of this case is set forth in detail in this Court's prior decision, *United States v. Thorn,* 317 F.3d 107, 111–117 (2d Cir.2003) (*"Thorn I "*). Thorn was the owner of A + Environmental Services, Inc. ("A+"), a company engaged in asbestos abatement projects in upstate New York. From 1990 to 1999, A+ employed approximately 700 people who worked primarily on commercial and residential asbestos removal. During this period, A+ undertook over 1,000 asbestos removal projects.

Asbestos removal is a highly regulated field. New York State and the federal government have enacted protective measures to safeguard workers, the public and the environment. *See* 29 C.F.R. § 1926.1101 (2002); 40 C.F.R. §§ 61.151, 61.145, 61.150, 61.154 (2002); N.Y. Comp. Codes R. & Regs. tit. 12, § 45 (2001). The relevant regulations include, for example, worksite requirements such as containment areas and ventilation; they also provide safety measures for workers and impose restrictions on removal techniques and disposal. In addition, notification and monitoring procedures enable government agencies to oversee regulatory compliance throughout the course of abatement projects.

Thorn was charged with nine counts of violating the Clean Air Act, codified at 42 U.S.C. § 7413(c), and one count of conspiracy to launder money in violation of 18 U.S.C. § 1956(a)(1)(A) and (h). He was tried before a jury. As described more fully in *Thorn I,* the Government's evidence depicted Thorn's scheme as involving the submission of low bids for abatement projects based on illegal shortcuts coupled with a pledge to customers to comply with all laws. In furtherance of the fraud, A+ prepared notification letters to regulatory agencies and kept them for the files but never submitted them. A+ directed employees to perform "rip and run" or "rip and skip" abatements—without

proper containment or clean-up—and then disposed of the asbestos without following required safety precautions. Independent laboratories and air monitoring companies assisted Thorn by preparing false reports, which A+ mailed to customers upon completion of the projects.

Customer payments for the illegally performed work were used to expand the business and engage in similar projects that quickly proliferated. Thorn falsified medical reports regarding employees' exposure to asbestos, which was extensive because they did not wear the protective gear required by law. *See, e.g.,* 29 C.F.R. § 1910.1001(e), (h). The evidence revealed that A+ employees as young as 14 years old consistently worked under conditions that did not comply with the safety regulations.

Following trial, the jury found Thorn guilty on all counts. On October 30, 2001, the District Court sentenced Thorn to 65 months in prison, forfeiture of $939,079.98, and payment of restitution in the amount of $299,593.40. Specifically, Thorn was sentenced to a total term of 65 months: 60 months each running concurrently on Counts 1 through 9, the Clean Air Act violations, and 65 months running concurrently on Count 10, the conspiracy to engage in "promotion" money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Arriving at this result, the District Court declined to follow certain recommendations made in the presentence report and rejected arguments advanced by the Government. In addition, the District Court applied a downward departure, dropping Thorn from Criminal History Category ("CHC") II to CHC I. The court also departed downward with respect to the money laundering guideline, reasoning that the violations in which Thorn engaged were outside the heartland of that guideline. No fine was imposed because the

District Court found that Thorn was unable to pay one.

The Government appealed the sentence, and Thorn cross-appealed, challenging his conviction. On appeal, this Court affirmed Thorn's conviction, vacated the sentence and remanded the case to the District Court on a number of bases argued by the Government on appeal. *Thorn I,* 317 F.3d 107.

On remand, the District Court resentenced Thorn to a period of 168 months' incarceration and ordered him to pay restitution of $299,593.40. Thorn now appeals the District Court's sentencing determinations relating to the Clean Air Act offenses and to the imposition of restitution. For its part, the Government challenges the District Court's refusal to enhance the Clean Air Act offenses as well as its decisions to depart downward from the money laundering guideline and from Thorn's CHC.

### Discussion

#### I. Thorn's appeal

Thorn asserts that his sentence should be vacated and remanded for resentencing on three grounds. Each of those grounds, which we discuss below, raises a threshold question as to what is properly before us to be considered on this appeal.

#### A. Imposition of a nine level increase for creating a substantial likelihood of death or serious bodily injury

At the initial sentencing, the District Court declined to increase the Clean Air Act violations' base offense level under Sentencing Guidelines § 2Q1.2(b)(2), which provides: "If the offense resulted in a substantial likelihood of death or serious bodily injury, increase by 9 levels." U.S. Sentencing Guidelines Manual

§ 2Q1.2(b)(2).[1] On appeal this Court rejected the District Court's finding that medical evidence and evidence of exposure to asbestos was too uncertain, and we remanded with instructions to impose the nine-level increase. *Thorn I,* 317 F.3d at 117–19.

■ At Thorn's resentencing, the District Judge commented on this Court's remand decision, disagreeing with its reasoning. He explained that—contrary to *Thorn I's* conclusion that two legal errors marked his earlier analysis—he had not misunderstood § 2Q1.2(b)(2) as either (i) requiring a showing of actual injury or death, rather than a substantial likelihood of those results, or (ii) limiting its applicability to situations in which persons other than non-participants are at risk. Rather, according to the District Judge, the finding that Dr. Levin's testimony was insufficient to support an enhancement under § 2Q1.2(b)(2) was attributable to an adverse credibility assessment, which the district judge described as follows:

> The [District] Court based its conclusion on the facts after reviewing all the evidence before it and determined that the government's proof, particularly the testimony of Dr. Levin, was unsupported by the available medical evidence and was to some extent incredible. In other words, the [District] Court made a credibility determination that found that Dr. Levin's testimony was unconvincing and too speculative a basis upon which to conclude that there was substantial likelihood of death or serious bodily injury.

The District Judge then imposed the nine-level increase. In doing so, however, his statements on the record give rise to appellant Thorn's argument on this appeal

that this Court should reverse its prior ruling and defer to what the District Judge has now articulated as his view of the evidence at the time he originally decided not to impose the increase.

■ The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent "cogent" and "compelling" reasons such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *United States v. Tenzer,* 213 F.3d 34, 39 (2d Cir.2000) (citations and internal quotation marks omitted). While we recognize that we are not bound by the law of the case, *id.,* it is nevertheless clear that the circumstances here do not present "cogent" or "compelling" justification to reverse the decision of the *Thorn I* panel that directed the District Court to impose the nine-level enhancement under § 2Q1.2(b)(2).

The resentencing "clarification," in which the District Court characterized its conclusion as an adverse credibility assessment, adds little to its original explanation for concluding that Thorn's conduct did not create a substantial likelihood of death or serious bodily injury. At the initial sentencing, the District Court ruled that "[t]here's just insufficient evidence to support the conclusion that any illness that might result from exposure to asbestos would cause serious bodily injury." On remand, the District Court explained that at the original sentencing it had determined that the Government's proof was unsupported and "to some extent incredible" and that Dr. Levin's testimony was "unconvincing and too speculative."

---

**1.** Citations herein are to the 2000 United States Sentencing Guidelines, which were in effect at the time Thorn was sentenced. *See* 18 U.S.C. § 3553(a)(4)(A) (2000) (providing that the sentencing court shall consider the Guidelines in effect on the date of sentencing).

Nothing in the resentencing remarks indicates that the newly denominated credibility assessment derived from observing the witness's demeanor rather than from the substance of the testimony. While the former commands great deference, the latter may be reviewed meaningfully by examining the transcript. *See, e.g., Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (noting that while Rule 52(a) of the Federal Rules of Civil Procedure commands greater deference to findings based on credibility, it "is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations"); *see also Doe v. Menefee,* 391 F.3d 147, 163–64 (2d Cir.2004) (discussing circumstances in which credibility determinations have been found clearly erroneous). This simply is not a situation in which the District Court relied on "'the look or manner of the witness: his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration'" or any other quality that a review of the transcript would not reveal. *See Arnstein v. Porter,* 154 F.2d 464, 470 (2d Cir.1946) (quoting *Regina v. Bertrand,* (1865–67) L.R. 1 P.C. 520, 535 (Austl.)). Rather, the District Court's assessment that the testimony was "incredible," "unconvincing and too speculative" is essentially the same as its initial finding that evidence was "insufficient"— both pertain to the content of the testimony, not to the witness's delivery.

Significantly, *Thorn I* did not remand for further findings or clarification, but expressly rejected the District Court's conclusion that the proof was insufficient in terms of medical evidence or evidence of exposure to asbestos. The Court found it "beyond peradventure that asbestos-related diseases, such as mesothelioma, asbestosis, and lung cancer, constitute serious bodily injury under the Guidelines."

*Thorn I,* 317 F.3d at 118 n. 7. Congress recognized the dangers of friable asbestos and identified it as a "hazardous air pollutant" in the early 1970s, and this Court has long acknowledged the attendant health risks. *See LaBounty v. Coughlin,* 137 F.3d 68, 74 n. 5 (2d Cir.1998) (citing *Envtl. Encapsulating Corp. v. City of New York,* 855 F.2d 48, 50 (2d Cir.1988)).

We held in *Thorn I:*

Thus, given the absence of an articulated reason to reject this undisputed evidence, it was clear error for the District Court to find that there was insufficient evidence that Thorn's conduct resulted in a substantial likelihood that at least one, if not several, of his former employees would develop devastating, life-threatening, asbestos-related diseases.

*Thorn I,* 317 F.3d at 119. This Court's previous conclusion resulted only from a "definite and firm conviction that a mistake [was] committed." *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). We agree, and we decline to disturb what has already been decided.

**B. Denial of Thorn's request for downward departure based on the nature and extent of the risk created by the Clean Air Act violations**

Thorn also contends that after imposing the nine-level enhancement directed by *Thorn I,* the District Court mistakenly concluded that it had no authority to consider a three-level downward departure. Thorn argued for the first time at resentencing that a departure from the nine-level enhancement was justified based on the nature of the risk created and the number of people subjected to it. *See* U.S. Sentencing Guidelines Manual § 2Q1.2(b)(2), cmt. n. 6. The Government contends that the District Court correctly

concluded that it was constrained by *Thorn I's* mandate from considering the departure.

■ In the initial sentencing proceedings, Thorn opposed the Government's application for the § 2Q1.2(b)(2) nine-point enhancement, consistently arguing that the adjustment should not apply. Thorn asserted that the Government's proof was insufficient to demonstrate that the Clean Air Act offenses resulted in a substantial likelihood of death or serious bodily injury warranting imposition of an enhancement pursuant to § 2Q1.2(b)(2). In addition, Thorn's presentence memorandum and his initial appellate brief advocated the propriety of refusing the enhancement or granting a departure based on the fact that the persons at risk for death or serious injury were co-conspirators. *See* Brief of Appellee/Cross-Appellant Joseph P. Thorn, at 11, n. 7, *Thorn I,* 317 F.3d 107 (No. 01-1669); Defendant's Sentencing Memorandum and Motion for Downward Departure, entered Aug. 2, 2001, at 14–15, *United States v. Thorn,* Docket No. 00–CR–088 (N.D.N.Y.). We specifically rejected this argument in *Thorn I,* finding that " § 2Q1.2(b)(2) is not limited to situations in which the offense conduct created a substantial risk of death or serious bodily injury to persons other than participants in the offense." *Thorn I,* 317 F.3d at 118 (declining to find a restriction not set forth expressly in the Guideline, given that "the Sentencing Commission knows how to limit an enhancement" based on victim complicity, *i.e.* § 2K1.4(a)(1)).

Thorn does not assert on this appeal that the District Court could have based a departure on an absence of innocent victims. Rather, Thorn now argues that the District Court erred by refusing to consider a departure based on "the nature of the risk created and the number of people placed at risk," pursuant to Application Note 6 of § 2Q1.2(b)(2), a theory he argued for the first time at his resentencing hearing.

■ Where necessitated by specific error(s), resentencing is limited, not *de novo. United States v. Quintieri,* 306 F.3d 1217, 1225–29 (2d Cir.2002) (unless the Court specifically provides for *de novo* sentencing or the "spirit of the mandate" requires *de novo* sentencing, a defendant may not raise matters not litigated at the initial sentencing). *Thorn I* identified particular sentencing issues necessitating remand, narrowly directing imposition of the nine-level enhancement under § 2Q1.2(b)(2) without inviting the District Court to consider downward departures. *Thorn I,* 317 F.3d at 117–19.

It is clear that the remand in this case was for limited, not *de novo,* resentencing. In this context, we will consider the issue of the three-level departure waived if Thorn, at the time of the initial sentencing, had "both an opportunity and incentive to raise it before the sentencing court or on appeal." *See Quintieri,* 306 F.3d at 1229 (concluding that "the law of the case ordinarily prohibits a party, upon resentencing or an appeal from that resentencing, from raising issues that he or she waived by not litigating them at the time of the initial sentencing"). Prior to the initial sentencing, Thorn knew that the Government was arguing for the § 2Q1.2(b)(2) enhancement and that the decision as to whether to impose it would be up to the District Court. Thorn had every incentive both to argue against the adjustment and to seek to diminish it on any available basis in the event it was imposed. He did so, however, only on the grounds of victim complicity.

■ Even in the case of a limited remand, we will not consider an issue waived if a sentencing determination becomes relevant only after appellate review or if the

matter is based on circumstances arising after the original sentence was imposed. *See id.* at 1229–30. Neither of these exceptions applies to the downward departure arguments at issue. Although the District Court initially declined imposition of the nine-level enhancement, thereby obviating further argument for departure, notice that the Government sought the adjustment gave Thorn the incentive and opportunity to assert every possible basis for departure. In addition, any facts relating to the nature and extent of the risk created by the offense conduct existed at the time of the original sentencing and subsequent appeal and, therefore, should have been raised to the District Court and to this Court at that time. *Id.* at 1229 n. 7 (a defendant who did not request a downward departure at an initial sentencing has waived the right to do so at a subsequent sentencing "based on *any grounds* available at the first sentencing" (emphasis added)); *see also United States v. Carpenter,* 320 F.3d 334, 341 (2d Cir.2003) (departure arguments based on grounds existing when the original sentence was imposed "were issues for [defendant] to establish at his first sentencing and sustain on appeal, if ever").

■ In addition, even if Thorn could have raised the argument on resentencing, we conclude that the facts foreclose a downward departure based on the nature and extent of the risk of death or serious injury resulting from Thorn's violations of workplace standards. Evidence at trial demonstrated that during the relevant period approximately 700 people, some of them young teenagers, worked on A+ friable asbestos projects amidst visible and substantial emissions of asbestos fibers, frequently without the benefit of respiratory protection.[2] On this record, it is simply not sustainable as a matter of law that an Application Note 6 downward departure could be given because the risk to health was not sufficiently serious or the number of people endangered was too small to support a nine-level enhancement. *Thorn I* implicitly held as much. *See United States v. Ben Zvi,* 242 F.3d 89, 95 (2d Cir.2001) (stating that law of the case doctrine " 'forecloses relitigation of issues expressly or *impliedly* decided by the appellate court' " (quoting *United States v. Bell,* 5 F.3d 64, 66 (4th Cir.1993))). The District Court correctly concluded that it could not consider the three-level downward departure from the nine-level enhancement under § 2Q1.3(b)(2) mandated by this Court.

### C. Imposition of restitution

■ Prior to the original sentencing, the Probation Officer's presentence report identified 130 A+ projects involving illegal asbestos abatement, false air analysis and mail fraud during the relevant period. Based on victim loss declarations, the Probation Department determined that restitution should be imposed, and at the original sentencing the District Court ordered

---

**2.** Specifically, the Government's evidence demonstrated that "A+ employed approximately 700 people on abatement projects from approximately 1990 to 1999; the average time spent on friable asbestos projects by these workers was fifty to sixty percent; thirty to forty percent of these workers did not use respirators; ninety percent of these workers smoked cigarettes; and the core group of A+'s workers worked an average of two to five years, and some worked up to eight years." *Thorn I,* 317 F.3d at 112. In addition there was testimony that "visible emissions of asbestos fibers were released into the air during many if not all projects, and several projects, as a result of the violations, resembled an indoor 'snow storm' or 'blizzard' due to the large amounts of asbestos in the air." *Id.* at 113. Two brothers, hired by Thorn at the ages of 14 and 16, testified to becoming covered with loose friable asbestos on a daily basis in the course of cutting and dumping bags filled with the material. *Id.* at 113–14.

Thorn to pay restitution in the sum of $299,593.40, pursuant to 18 U.S.C. § 3663A, which provides in relevant part:

(a)(1) Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order ... that the defendant make restitution to the victim of the offense ...

(2) For the purposes of this section the term "victim" means a person directly and proximately harmed as a result of the commission of an offense ...

....

(c)(1) This section shall apply in all sentencing proceedings for convictions of ... any offense ...

(B) in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.

18 U.S.C. § 3663A.

Thorn's challenge to the restitution order is not preserved for appeal. For the reasons discussed in Point I.B, *supra*, Thorn waived his objection by not raising it when he first had the incentive and opportunity to do so. Having made no objection at the first sentencing hearing and on the first appeal, he still did not object to the restitution order before the District Court at the time of the second sentencing proceeding.

We find no "cogent" or "compelling" reason to overlook Thorn's failure to raise the issue of restitution at any prior point in these proceedings. *See Quintieri*, 306 F.3d at 1230. Nor does the imposition of restitution constitute plain error. *See United States v. Olano*, 507 U.S. 725, 731–32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (under Rule 52(b), the discretion to correct forfeited errors should not be exercised unless the error is plain, affects substantial rights and "seriously affects the fairness, integrity or public reputation of judicial

proceedings") (internal quotation marks and citations omitted). This portion of the Amended Judgment is affirmed.

## II. The Government's Appeal

### A. Standard of review

▮▮▮ We conduct our review of sentences under a "reasonableness" standard. *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir.2005). "Reasonableness" review is not limited to consideration of the length of the sentence. Without regard to its length, a sentence is not reasonable if legal errors led to its imposition. *Id.*

▮▮▮ We review issues of law *de novo*, issues of fact under the clearly erroneous standard, mixed questions of law and fact either *de novo* or under the clearly erroneous standard depending on whether the question is predominantly legal or factual, and exercises of discretion for abuse thereof. *United States v. Selioutsky*, 409 F.3d 114, 119 (2d Cir.2005).

Ordinarily, post-*Booker*, we would remand for the district court to consider whether the original sentence—imposed pre-*Booker* on the then-valid mandate of the Guidelines—would have been different if the district judge had appreciated his discretion to frame the sentence based on the fact that the Guidelines are advisory.

*United States v. Rubenstein*, 403 F.3d 93, 98 (2d Cir.2005) (citing *Crosby*, 397 F.3d at 117–18). When we conclude, however, that a District Court's sentencing adjustments were made in error, and could have an appreciable influence on the District Court's discretionary sentencing on remand, we may undertake a pre-remand analysis of the issues. As we have explained:

This Guidelines analysis does not, however, foreclose future reasonableness review of defendant['s] sentence on other

grounds (including those enumerated in 18 U.S.C. § 3553), and we express no opinion as to whether an incorrectly calculated Guidelines sentence could nonetheless be reasonable. And because the Guidelines error non-trivially affected the Guidelines sentence imposed as a mandate, vacatur of the sentence is necessary without reference to *Blakely* or *Booker* or the principles of resentencing set out in *Crosby*.

*Id.* at 99.

## B. Refusal to apply an abuse of trust enhancement

*Thorn I* remanded for further consideration the District Court's refusal to apply an enhancement on any of the counts based on an abuse of trust. *Thorn I*, 317 F.3d at 119–23. Guidelines § 3B1.3 provides for a two-level increase for abuse of a position of trust or use of a special skill, "in a manner that significantly facilitated the commission or concealment of the offense" with the caveat that "if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role)." U.S. Sentencing Guidelines Manual § 3B1.3. At the initial sentencing, the District Court reasoned that Thorn's conduct involved the use of a special skill, but not an abuse of trust, and further reasoned that because Thorn received an aggravating role adjustment, no further adjustment under § 3B1.3 could be made. *Thorn I*, 317 F.3d at 120–21.

Noting that it appeared from the record that Thorn's clients deferred to him because of his skill rather than as a result of a special relationship of trust and confidence, *Thorn I* did not rule out the possibility that Thorn could have occupied a position of trust. *Id.* at 121–22. The Court remanded the issue to the District Court for specific findings regarding the degree of discretion accorded Thorn by his clients, stating:

> Thus, we remand this issue to the District Court for specific findings consistent with this opinion, including whether any customers entrusted Thorn with discretion to complete the asbestos projects without supervision and without relying on the independent laboratory test results to confirm compliance with state and federal regulations. [FN9]
>
> [FN9] If the District Court were to find that one or more clients did grant such discretion and that this discretion put Thorn in a position of trust under § 3B1.3, the District Court would then need to make a specific finding whether Thorn used such a position of trust in a manner that significantly facilitated the commission or concealment of the offense.

*Id.* at 122–23 & n. 9.

 Whether Thorn occupied a position of trust within the meaning of § 3B1.3 is considered from the victim's viewpoint and presents a question of law subject to *de novo* review. *See, e.g., United States v. Hirsch*, 239 F.3d 221, 227 (2d Cir.2001). The determination of whether a defendant utilized a position of trust or special skill in a manner that significantly facilitated the commission or concealment of the offense is a question of fact reviewed for clear error. *Id.* The enhancement is warranted if the victim entrusted the defendant with discretionary authority that enabled the defendant either to commit a crime or evade detection. *See, e.g., United States v. Santoro*, 302 F.3d 76, 79 (2d Cir.2002). Arms-length commercial dealings do not give rise to the type of fiduciary relationship contemplated by § 3B1.3. *Hirsch*, 239 F.3d at 227 ("An abuse of trust enhancement may not be imposed on a defendant convicted of fraud solely because of a violation of a legal

obligation to be truthful and a victim's reliance on a misrepresentation."). Rather, an adjustment under this Guideline is appropriate where the defendant misuses "substantial discretionary judgment that is ordinarily given considerable deference" to achieve or conceal criminal conduct. *See* U.S. Sentencing Guidelines Manual § 3B1.3, cmt. n. 1.

 On remand, the Government's witness, Terry Pandolfi, testified to the following facts. Pandolfi was a homeowner and mother of two young children. She hired Thorn to remove asbestos from her basement. In response to Pandolfi's telephone inquiry, Thorn visited her home and listed the steps that would be taken "to separate the area, remove the asbestos in a way that would not expose it to me or my children." Thorn assured his prospective customer "that the asbestos was going to be properly removed; it would be removed and all the work performed when my children and I were out of the house; that the work would be completely done and we would have absolutely no exposure to any asbestos as a result of any of the work performed." Thorn "clearly looked around and could see there were kids and his answer was very much broader than [other contractors'] about taking safety steps." He also specifically assured her that his work would comply with the law. In addition, Thorn explained "all of the ways he was going to keep my children and [me] safe by not exposing us to the asbestos in any way."

Pandolfi hired Thorn because she "believed him [and] ... trusted he would do those things," but she did not "know actually if he did do them." Pandolfi explained that Thorn had separate and independent access to Pandolfi's basement for the work, which was performed when she was not present. Although the basement door was covered with plastic for two days during the removal project, Pandolfi could have accessed the area where A+ was working through another entrance, but she did not do so. Pandolfi testified that she did not expect to receive and did not receive a laboratory report analyzing asbestos samples from her basement. According to Pandolfi, her basement looked the same immediately following the removal project as it did before the project started, and she did not observe an accumulation of dust until a month or two after A+ completed the work.

After hearing Pandolfi's testimony, the District Court made the following findings:

> Ms. Pandolfi's testimony indicated that she did provide defendant with absolute discretion in completing an abatement job at her home, she paid him without relying on any independent laboratory tests. Arguably, this could place defendant in a position of trust. However, it does not necessarily follow that defendant used his position of trust in the manner that significantly facilitated the commission or concealment of the offense. Defendant did not appear to try to conceal his shoddy work, at least not in her situation. Her testimony indicated that the dust left behind would have filled two trash bags, it was all over the children's toys; thus, had she looked in her basement at any time, it would have been obvious to her that such was the case, that defendant was not performing the abatement in a safe manner.

At issue is whether Thorn abused a position of trust in a manner that "significantly facilitated" either the "commission or concealment of the offense." *See* U.S. Sentencing Guidelines Manual § 3B1.3. The passage quoted above reveals that the District Court focused only on the concealment prong of the Guideline. The District Court erred by failing to determine whether the "arguable" position of trust Thorn

occupied with respect to the victim witness significantly facilitated the commission of the offense by lulling the homeowner into not taking steps to monitor the project. Although the District Court is no longer bound to apply the Guidelines, its duty under 18 U.S.C. § 3553(a) to "consider" the applicability of this "Role in the Offense" enhancement continues. *See Crosby,* 397 F.3d at 111–12.

The finding that defendant used his special skills to get hired and secure "absolute discretion" in doing the job is sufficient as a matter of law to establish that Thorn's abuse of Pandolfi's trust facilitated the crime. Moreover, the district court's finding is also sufficient as a matter of law to establish that Thorn's abuse of this trust aided in the concealment of the crime because Thorn's assurances led Pandolfi to forego independent testing to ensure the asbestos had been properly removed. Although Thorn might have corrupted that testing, as he had done with others who hired him, his abuse of Pandolfi's trust saved him that step and ensured that Pandolfi would not find a way to discover his illegal conduct with independent testing. Accordingly, we instruct the District Court to impose on the Guidelines calculation the two-level abuse-of-trust enhancement.

. C. Departure from Guideline § 2S1.1 based on "atypical" money laundering

■■ At Thorn's initial sentencing, the District Court granted a downward departure from the money laundering guideline, § 2S1.1, holding that Thorn's offense was atypical because it did not involve a widespread or far-reaching scheme, such as drug trafficking or organized crime. *Thorn I,* 317 F.3d at 126. On appeal, the Court directed the District Court to reconsider its conclusion in light of *United States v. McCarthy,* 271 F.3d 387 (2d Cir.

2001), which was announced after Thorn's initial sentencing. This Court reasoned:

> We believe that the District Court made an error of law in granting a heartland departure in this case, to the extent it based its decision on a finding that Thorn's offense was atypical, and thus outside of the heartland, because he did not launder the proceeds of serious crimes like drug trafficking and organized crime.

*Thorn I,* 317 F.3d at 126.

The Government appeals the District Court's decision on remand, in which it again concluded that the case was outside of the heartland, stating:

> In [*McCarthy*] the Second Circuit noted that the district court had correctly found that the defendant's conduct did not represent an atypical money laundering case because the way in which the funds were laundered was critical to the scheme's success. In this case, unlike the situation in *McCarthy,* the Court finds, based upon all the evidence presented, that the way in which defendant laundered the funds in this case was not critical to the success of the defendant's scheme, nor, significantly, did defendant make any effort to conceal the funds that he received as a result of performing the asbestos abatement projects. Rather, this case is, in substance, a routine fraud case in which the money laundering was minimal when evaluated against the overall offense conduct and was no more than an incidental by-product of the underlying fraud. Therefore, for the Court to apply the money laundering guideline in this case would be to let the "tail wag the dog," quote-unquote, and I'll cite *United States [v.] Diaz,* 245 F.3d 294, 306.
>
> Accordingly, the Court finds that this case is outside the heartland of money laundering cases, and therefore, I will

depart and apply the fraud guidelines in computing defendant's sentence.

Notably, the Third Circuit's *Diaz* decision, on which the District Court relied, concluded that sentencing under the money laundering guidelines is inappropriate when, among other things, the defendant does not reinvest funds in additional criminal activity. *See United States v. Diaz,* 245 F.3d 294, 310 (3d Cir.2001). *Thorn I* specifically rejected defendant's argument that he had not used the funds for further illegal conduct. *Thorn I,* 317 F.3d at 113, 133.

■ Before *Booker,* whether the facts take Thorn's case out of the money laundering heartland was a legal issue for *de novo* review under the PROTECT Act, codified at 18 U.S.C. § 3742(e). *See United States v. Brady,* 417 F.3d 326, 332 (2d Cir.2005). After *Booker's* excision of § 3742(e), however, we review for "reasonableness." *Id.*

> An error in determining … the availability of departure authority remains … the type of procedural error that could render a sentence unreasonable under *Booker* …. A district court abuses or exceeds the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions.

*Id.* at 332–33 (internal quotation marks and citations omitted) (first ellipsis in original).

The imposition of a sentence outside the applicable Guideline range pursuant to § 5K2.0 is appropriate where "certain aspects of the case [are] found unusual enough for it to fall outside the heartland of cases" within that Guideline. *Koon v.*

*United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). If the District Court relies on a factor that is not unusual under the circumstances presented, then the decision may be overturned. *Id.* at 100, 116 S.Ct. 2035. Turning to that analysis, the District Court's interpretation of *McCarthy* is faulty in several respects.

First, in *McCarthy* this Court agreed with the District Court that the embezzlement offense at issue was not "atypical" and therefore denied the defendant's motion to depart downward. We noted that the laundering at issue was critical to the defendant's offense. *McCarthy,* 271 F.3d at 402. Contrary to the District Court's conclusion, we do not construe *McCarthy* as holding that sentences imposed within the money laundering Guideline range must be supported by evidence establishing that the way in which the funds were laundered was critical to the enterprise. In *McCarthy,* where we deferred to the District Court's refusal to downwardly depart, we stated:

> Further, even if we were to review the decision, we do not believe the district court erred. Assuming *arguendo* that a court's choice of a guideline is reviewed by determining if defendant's conduct falls outside the heartland of cases typically within the guideline, the district court correctly found McCarthy's conduct did not represent an "atypical" money laundering case. *See Sabbeth,* 262 F.3d at 220 (declining to adopt heartland analysis for use in reviewing guidelines selection, but applying the analysis *arguendo* ). Here, laundering the Plans' money through the Alliance and Lions accounts was critical because, as the district court noted, those receiving payment "in all probability never would have accepted a check in payment for various commercial obligations that was drawn on a 401k plan or an employ-

ee pension plan. That occurrence would have been the most conspicuous of red flags." Nor are we persuaded McCarthy's money laundering case is atypical because "the funds in question were not proceeds of serious crime such as drug-trafficking or mob-related activities." We do not believe the money laundering guidelines are limited only to proceeds derived from drugs or organized crime. *See United States v. Kayode*, 254 F.3d 204, 215–17 (D.C.Cir.2001) (collecting cases). Thus, the district court used the correct guideline in sentencing McCarthy.

*McCarthy*, 271 F.3d at 402.

Furthermore, even if we accept the District Court's interpretation of *McCarthy*, the transactions upon which Thorn's money laundering conviction was based—payroll payments, supply purchases, insurance and other operating expenses of the business—were essential to maintaining the scheme. *Thorn I*, 317 F.3d at 113, 133–34. *Thorn I* expressly rejected Thorn's argument that expending mail fraud proceeds on legitimate office expenses does not constitute promotion money laundering as a matter of law. *Id.* at 133–34. The Court concluded that "[t]he deposit was not merely the completion of the scheme but enabled the conspirators to continue conducting the illegal abatement scheme." *Id.* at 134.

In rejecting Thorn's challenge to the sufficiency of the evidence supporting the money laundering conviction, this Court reiterated that "we demand evidence that the receipt and deposit of laundered funds was made with the intent to promote the specified underlying unlawful activity, be it, for example, by promoting continued illegal activity or by being essential to the completion of the scheme." *Id.* at 133; *see also United States v. Kalust*, 249 F.3d 106, 110 n. 5 (2d Cir.2001) (rejecting the notion

that all "receipt and deposit" cases fall outside the heartland range as a matter of law). As noted in *Thorn I*'s recitation of facts:

> Thorn testified that his business "grew almost geometrically each year." Office Manager Dawn Dayter testified that the funds obtained from illegal projects were used to "finance the next project" as well as to pay office expenses. Craig Ingalls, a former A+ employee, similarly explained that "the money obtained from illegal projects was used to continue and expand the business and perform additional illegal work."

*Thorn I*, 317 F.3d at 113.

Second, the District Court reasoned that it was "significant" that Thorn did not attempt to *conceal* the proceeds of the scheme. This analysis misses the mark because Thorn was charged with promotion money laundering (18 U.S.C. § 1956(a)(1)(A)(i)—not concealment money laundering (18 U.S.C. § 1956(a)(1)(B)(i)). We previously have acknowledged a legislative intent "to reach conduct that went beyond the concealment of proceeds of criminal activity." *See United States v. Skinner*, 946 F.2d 176, 178 (2d Cir.1991). Thorn used the proceeds of his illegal scheme to continue and expand it. *Thorn I*, 317 F.3d at 133–34. Also relevant to the outcome of this issue is the following fact that was noted in *Thorn I*:

> [t]he defendant in fact concedes that the language of the [money laundering] statute "would embrace the conduct for which the defendant was indicted and convicted here," but he asserts that Congress intended the statute, which was enacted as part of the Anti–Drug Abuse Act of 1986, "primarily to combat large amounts of money being laundered by the drug trade and organized crime." In support of this argument, Thorn does

not cite any controlling Circuit case law, however, and he fails to address—much less distinguish—*McCarthy*.

*Id.* at 128.

Finally, the District Court's comment that the money laundering in this case was "minimal when evaluated against the overall offense conduct" ignores the fact that at the time of sentencing, § 2S1.1 measured the seriousness of the crime by the value of the laundered funds, not the nature of the underlying misconduct. *See id.* The District Court committed an error of law and thus abused its discretion in concluding that Thorn's money laundering was atypical based on the manner in which the funds were laundered, the lack of efforts to conceal the funds, and a comparison between the money laundering and the underlying offense conduct. Accordingly, we vacate the finding that Thorn's money laundering offense is outside of the heartland, and we remand with instructions to use Guideline § 2S1.1, without deviation, to determine the applicable category of offense under 18 U.S.C. § 3553(a), which will be one factor in the District Court's sentencing decision. Our pre-remand analysis and determination of this Guideline issue is based on the conclusion that the District Court's error in departing from the money laundering guideline may affect resentencing to the extent that the resulting sentence is unreasonable. *See Rubenstein*, 403 F.3d at 99. Our decision eliminates a challenge to the reasonableness of the discretionary sentence that the District Court will impose on remand on the ground "that it was made under the influence of these enhancement rulings." *Id.*

### D. Departure from Criminal History Category II to Criminal History Category I

Thorn had two prior convictions—one in 1985 for driving while intoxicated and one in 1993 for filing a false representation that his asbestos business had certain required insurance coverage—which placed him in Criminal History Category II. At the initial sentencing the District Court, *sua sponte*, granted a criminal history departure stating that Thorn's history was "overrepresented" and was "better represented by Criminal History Category I." *Thorn I*, 317 F.3d at 128–29. On appeal, the Court noted that "the District Court did not articulate its findings of fact or conclusions of law that support a finding that Category II significantly overrepresented Thorn's criminal history" and remanded to the District Court for specific findings and to permit the Government to oppose the departure. *Id.* at 131.

At resentencing, Thorn sought a downward departure from Category II, arguing that his prior convictions were in the distant past. The District Court granted the motion, ruling as follows:

The Criminal History Category remains at II as set forth in the presentence report initially. The guideline imprisonment range would be 235 months to 293 months. However, with respect to criminal history, this court finds that the seriousness of the defendant's criminal history is overrepresented by the Criminal History Category II.

A major consideration of this Court, as is required under the guidelines, that the Court consider the possibility of likelihood of recidivism. The Court does not find his prior convictions, DWI and the other conviction, indicates a likelihood of recidivism based upon that conduct, and for that matter, given the fact that the criminal conduct involves violation of the Clean Air Act and removal of asbestos, it's clear that the defendant would not be engaged in that kind of activity again, so the chance for recidi-

vism in this area is completely absent. Furthermore, I considered all the other factors and circumstances, the conduct for which he was previously charged, the nature and seriousness of the offense and conviction, approximate time, and I find that it is more—it is over—overrepresents his Criminal History Level and that a Criminal History Level I would be more appropriate. Therefore, I'm going to make that departure.

As an initial matter, we note that the District Court's remand decision is as devoid of specific findings as was its original decision, which this Court was unable to assess for abuse of discretion. *See Thorn I*, 317 F.3d at 131. We stress the importance of the District Court's obligation under 18 U.S.C. § 3553(c) to explain the reasons supporting the sentence imposed which, among other things, aids this Court's review.

The Government contends that the District Court erred in granting the CHC departure. We agree. Certain facts in this case resemble those that the Guidelines exemplify as supporting a conclusion that a defendant's criminal history is significantly less serious than that of most defendants in the same criminal history category. *See* U.S. Sentencing Guidelines Manual § 4A1.3 cmt. n. 3 (sentencing courts may consider a downward departure where "a defendant with two minor misdemeanor convictions close to ten years prior to the instant offense"). Other critical facts, however, distinguish Thorn's history and render any such conclusion insupportable. Specifically, Thorn continued illegal asbestos abatement activities following adverse civil adjudications for conduct similar to that resulting in his conviction.

Prior to the initial sentencing, the Probation Department reported that in 1993, Thorn was prosecuted for falsifying documents related to his business insurance. Because of that violation and the 1993 misdemeanor conviction for Offering to File a False Instrument, A+ was prohibited from performing asbestos abatement projects. To circumvent that ban, Thorn started up a new company, A–Plus Environmental Services ("A–Plus"), falsely representing to officials that he was one of several owners of the business. Thereafter, the Occupational Safety and Health Administration ("OSHA") cited A–Plus for several violations, which Thorn resolved by entering into a settlement with OSHA that required him to pay a fine and pledge that future asbestos abatement projects would comply with all state and federal laws. The following year, an investigation by the New York State Department of Labor revealed prevailing wage violations by A–Plus for which Thorn paid restitution to A–Plus employees.

Nothing in the District Court's decision reflects consideration of Thorn's civil adjudications, which counsel against a downward departure in his criminal history category. *See* U.S. Sentencing Guidelines Manual §§ 2Q1.2, cmt. n. 9 ("Where a defendant has previously engaged in similar misconduct established by a civil adjudication or has failed to comply with an administrative order, an upward departure may be warranted."); 4A1.3(c) (identifying "prior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order" as reliable information that may indicate the inadequacy of a criminal history category); *see also United States v. Brennan*, 395 F.3d 59, 71 (2d Cir.2005) (concluding that there was no error in upward criminal history category departure based on prior civil adjudications). Nor did the District Court explain its conclusion that there is no risk of recidivism in this case. On this record, the conclusion simply is not supportable:

Thorn demonstrated a repeated willingness to persist in illegal asbestos removal activities despite having been prohibited from the field in its entirety and despite having agreed previously that he would perform asbestos projects in compliance with the law.

These factors belie any suggestion that CHC II overrepresents Thorn's criminal history. We conclude, therefore, that the District Court abused its discretion by departing to CHC I, and we further conclude that the erroneous adjustment may have an appreciable influence on the District Court's discretionary sentencing on remand. *See Rubenstein,* 403 F.3d at 99. Accordingly, the District Court's criminal history determination is vacated and remanded, and on resentencing the District Court is instructed to use CHC II in its Section 3553(a)(4) calculation to determine the kind of Guidelines sentence and sentencing range that will then be considered along with the other Section 3553 factors in deciding what sentence to impose. *See* 18 U.S.C. § 3553.

### Conclusion

For the foregoing reasons, the Amended Judgment of the District Court is affirmed in part, vacated in part, and the case is remanded for resentencing consistent with this opinion and *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and not inconsistent with *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005).