**UNITED STATES of America,**
**Appellee,**

v.

**Marvin RUBENSTEIN, aka Jacob Rubenstein, Isaac Rubenstein, Defendants–Appellants.**

**Docket No. 03–1721.**

United States Court of Appeals,
Second Circuit.

Argued: Dec. 6, 2004.

Decided: March 31, 2005.

Jeremy Gutman (Lawrence Herzog, on the brief), New York, N.Y. for defendants-appellants.

Andrew J. Frisch, Assistant United States Attorney for the Eastern District of New York, Brooklyn, N.Y. (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, David C. James, Assistant United States Attorney for the Eastern District of New York, on the brief) for appellee.

Before: CARDAMONE, JACOBS, and CABRANES, Circuit Judges.

Judge CARDAMONE concurs in the majority opinion and in a separate concurring opinion.

JACOBS, Circuit Judge.

Marvin Rubenstein and Isaac Rubenstein (collectively "defendants") appeal from judgments of the United States District Court for the Eastern District of New York (Block, *J.*), convicting them after a jury trial of violating the work-practice standards for asbestos set out in the Clean Air Act, *see* 42 U.S.C. § 7412 *et seq.*, 40 C.F.R. §§ 61.145, 61.150, and of conspiracy to do so. Defendants challenge their convictions on the ground that the district court's instruction that the jury could find that defendants knowingly violated the Clean Air Act if they found that defendants knew that the renovation involved asbestos erroneously failed to require any finding of "wrongful intent." Defendants contend that they live in an insular religious community of Hasidic Jews in which the dangers of asbestos are not a matter of common knowledge or interest. The defendants also challenge the imposition of certain sentencing enhancements, including whether the sentences were properly enhanced pursuant to Sentencing Guideline Section 2Q1.2(b)(4) for failure to obtain a New York State permit notwithstanding that the Clean Air Act itself contains no such permit requirement. For reasons that follow, we affirm the convictions, and remand to the district court with instructions to vacate the sentences and to conduct resentencing consistent with this opinion and *United States v. Booker*, —— U.S. ——,

125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and not inconsistent with *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005).

# I

" 'Because defendants appeal their convictions after a jury trial, our statement of the facts views the evidence in the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor.' " *United States v. Monaco*, 194 F.3d 381, 383–384 (2d Cir. 1999) (quoting *United States v. Salameh*, 152 F.3d 88, 107 n. 1 (2d Cir.1998) (*per curiam* )).

For over 30 years, the Rubenstein family owned a commercial building at 2 Prince Street in Brooklyn, New York. As of 2000, the building was owned by Philrub Realty Corporation, of which Marvin Rubenstein was president. Among the building's commercial tenants was a sweater factory owned by the Rubenstein family, Atlas Knitting, Inc., which was run by Marvin Rubenstein and his mother, Bella Rubenstein. Marvin's son, Isaac Rubenstein, assisted his father in running Atlas Knitting and in managing 2 Prince Street.

In April 2000, a real estate developer, Erik Ekstein, expressed interest in acquiring 2 Prince Street. After observing what he believed was asbestos on exposed pipes at the property, Ekstein hired an environmental consultant who inspected the property on May 1, 2000, and removed samples from pipes. Isaac accompanied the consultant on the inspection. At one point, Isaac offered to help in removing one of the samples, but the consultant declined, advising Isaac that the material contained asbestos. Ekstein's consultant testified that she used the word "asbestos" approximately ten times during her conversations with Isaac that day.

In July 2000, Marvin and Ekstein executed a 49–year, $50 million lease. Marvin orally agreed to remove the asbestos as a condition of the lease.

In December 2000, Marvin hired men who he had previously employed at Atlas Knitting to remove all pipe insulation at 2 Prince Street, including Jose Jimenez, his brother Juan, and Carlos Perez. Marvin did not tell them that the material was asbestos. Marvin directed the men to remove the material with a knife or scissors and to put it in boxes. Although Marvin and Bella Rubenstein were present during this work, neither wore protective clothing.

From December 4 through 7, 2000, Ekstein's contractors performed demolition work at 2 Prince Street. The supervising contractor discovered dry asbestos in boxes (the top flaps of which were "crisscrossed" rather than sealed), and observed Marvin ordering his workers in Spanish to place the boxes in a garbage compacting truck. On December 5, Ekstein's contractor informed Marvin's workers that they were removing asbestos and provided them with dust masks.

On February 8, 2001, Ekstein told Marvin that the asbestos could not be removed in the manner in which Marvin directed. Marvin replied: "[D]on't worry about it, this is blown out of proportion, it is not that big a deal."

Throughout that day, officials from the New York City Department of Environmental Protection ("DEP") visited the premises. Marvin told them that he and Isaac had hired men off the street to remove the insulation without knowing that it contained asbestos, that removal began earlier that week, and that the insulation was boxed and taken to a warehouse. Isaac told the officials that the men were hired off the street to remove asbestos, that removal work had begun that day, and that no asbestos was transported from the building. Although Isaac used the

term "asbestos" in his initial conversation with the first DEP official to arrive at the property, Isaac later denied knowing the nature of the insulation material. Photographs taken that day showed exposed asbestos hanging from pipes and in open boxes.

DEP's director of asbestos enforcement advised Marvin and Isaac that the building was contaminated, that they needed to hire a contractor to remove the asbestos, and that no contractor could begin work without DEP approval. Federal authorities were notified.

On Friday, February 9, 2001, the DEP Commissioner issued an order directing defendants to vacate the building, to submit by the next day a "scope of work" order for DEP approval, and to remediate the asbestos contamination.

Also on February 9, 2001, FBI agents visited 2 Prince Street and interviewed Marvin and Isaac separately. Both Marvin and Isaac told the agents that they hired workers off the street to perform asbestos removal and that they directed the workers to box the removed material.

Despite the DEP's explicit instructions, an asbestos contractor toured the property on February 11, 2001, and, at Isaac's request, agreed to remove the asbestos that same day for a $10,000 cash payment. Isaac informed the contractor that he need not submit a "scope of work" order to the DEP and that he should lock the door if the DEP came around. While the contractor was preparing to remove the asbestos, the DEP's director of asbestos arrived at the scene and discovered that preparations were underway to remove the asbestos. The next day, a different asbestos contractor submitted and obtained DEP approval for a "scope of work" order and subsequently performed the asbestos abatement to the satisfaction of DEP.

On June 27, 2001, Isaac (accompanied by counsel) met with two federal agents and an Assistant United States Attorney, and gave four varying accounts of the asbestos removal. Isaac said that he had never heard the word "asbestos" until his February 8, 2001 meeting with DEP officials.

At trial, before summations, Judge Block rejected defendants' request that he charge that jury that:

The government must also prove beyond a reasonable doubt that the defendants are "reasonable" such that they would also have known that asbestos is regulated and that some form of liability flows from violating regulations such as work-practice standards.

Instead, Judge Block instructed the jury, pursuant to *United States v. Weintraub*, 273 F.3d 139, 147 (2d Cir.2001), that the government must prove only that defendants knew that the substance removed was asbestos and were aware of the manner in which it was removed.

## II

■ On appeal, defendants argue that Judge Block's jury instruction erroneously permitted the jury to convict without finding that defendants were aware of asbestos regulation. We review the district court's jury instruction *de novo*, but will reverse only if the charge as a whole caused prejudice. *See United States v. Bok*, 156 F.3d 157, 160 (2d Cir.1998); *United States v. Locascio*, 6 F.3d 924, 939 (2d Cir.1993).

■ A person is criminally liable under the Clean Air Act if he *"knowingly violates* any requirement or prohibition of ... section 7412 of this title." 42 U.S.C. § 7413(c)(1) (emphasis added). The phrase "knowingly violates" bespeaks "knowledge of facts and attendant circumstances that comprise a violation of the statute, not specific knowledge that one's

conduct is illegal." *Weintraub,* 273 F.3d at 147; *see also United States v. Buckley,* 934 F.2d 84, 88 (6th Cir.1991) (holding, in a case involving the Clean Air Act asbestos work-practice standards, that "knowingly violate[s]" does not require knowledge of the illegality of one's conduct). Under this standard, because "no one can reasonably claim surprise that asbestos is regulated and that some form of liability is possible for violating those regulations," *Wein-traub,* 273 F.3d at 151, to sustain a conviction for violation of asbestos work-practice standards, the government need only prove that a defendant knew that the material being removed was asbestos.

Defendants seize upon the adverb "reasonably," and claim that they are not the "reasonable" people contemplated in *Weintraub* because they belong to an insular religious community of Hasidic Jews in which asbestos is not a subject of interest, and because they are not influenced or educated by outside media by virtue of their insulated lives. They contend therefore that it was never proved that they appreciated the dangers of the material.

We are unconvinced. The defendants may be immersed in a culture that does not concern itself with the environmental hazards of asbestos, but that does not bear upon the nature of the prohibition. The statute presupposes a knowledge that asbestos is a regulated material, the way other criminal statutes presuppose basic knowledge of the physical world; and there is no basis for the defendant's contention that this is a rebuttable presumption.

■ In any event, even if a good faith defense had been available, the defendants would not have been entitled to it. The defendants are sufficiently worldly to own the asbestos-contaminated real estate and to negotiate for its removal as a condition of a $50 million lease. They were also notified that asbestos was a regulated substance prior to their attempts to remove it from their building. Even after the defendants were directly confronted by authorities, they did not conform their behavior to the regulatory requirements. Instead, they lied about their criminal activities and attempted to circumvent the law. Their claim that they acted in good faith and were ignorant of the attendant dangers of their conduct is therefore without foundation. *See United States v. Workman,* 80 F.3d 688, 702 (2d Cir.1996) (concluding that the District Court did not err in refusing to instruct the jury on a defense for which there was no evidentiary foundation). Accordingly, the district court properly rejected defendants' suggested charge and instructed the jury pursuant to *Weintraub.*

## III

Defendants challenge three sentencing enhancements and allege that various aspects of their sentences violate *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), "a ruling that *Booker* has now explicitly applied to the Guidelines." *United States v. Williams,* 399 F.3d 450, 453 (2d Cir. 2005).

Ordinarily, post-*Booker,* we would remand for the district court to consider whether the original sentence—imposed pre-*Booker* on the then-valid mandate of the Guidelines—would have been different if the district judge had appreciated his discretion to frame the sentence based on the fact that the Guidelines are advisory. *See Crosby,* 397 F.3d at 117–18. Here, however, we conclude that the sentencing enhancements—one of which was made in error—may have an appreciable influence even under the discretionary sentencing regime that will govern the resentencing, and under which the Guidelines sentence will be a benchmark or a point of reference

or departure. *See id.* Our decision of these Guidelines issues obviates any future challenge to the reasonableness of a discretionary sentence on the ground that it was made under the influence of these enhancement rulings.[1] This Guidelines analysis does not, however, foreclose future reasonableness review of defendants' sentence on other grounds (including those enumerated in 18 U.S.C. § 3553), and we express no opinion as to whether an incorrectly calculated Guidelines sentence could nonetheless be reasonable. And because the Guidelines error non-trivially affected the Guidelines sentence imposed as a mandate, vacatur of the sentence is necessary without reference to *Blakely* or *Booker* or the principles of resentencing set out in *Crosby.*

█ This Court reviews the district court's interpretation of the Sentencing Guidelines *de novo, see United States v. Adler,* 52 F.3d 20, 21 (2d Cir.1995) (*per curiam* ), and reviews the district court's findings of fact for clear error, *United States v. Jones,* 30 F.3d 276, 286 (2d Cir. 1994); *United States v. Cousineau,* 929 F.2d 64, 67 (2d Cir.1991).

█ First, defendants challenge the sentence enhancement made under Sentencing Guideline Section 3B1.1, on the ground that the evidence was insufficient to establish that either defendant acted as a leader or supervisor, or that the criminal activity was "otherwise extensive." Three factors determine whether an activity is "otherwise extensive": "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities

were organized .or led by the defendant with specific criminal intent; [and] (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme." *United States v. Carrozzella,* 105 F.3d 796, 803–04 (2d Cir.1997) *abrogated in part on other grounds, United States v. Kennedy,* 233 F.3d 157, 160–61 (2d Cir.2000). Here, as the district court found, there were at least two knowing participants—Marvin and Isaac—and as many as seven participants who were unknowing, including the three named workers and another four day laborers (including two men Isaac admitted hiring "off the street"). The labor of these persons was clearly necessary to the violation. Under the direction of Marvin (as president of the corporate entity that owned 2 Prince Street), the men worked without protective clothing to: cut asbestos off the pipes, place it in unsealed containers and load the boxes into a compactor truck.

█ These facts support the district court's determination that Marvin was the leader of the criminal activity. As to Isaac, there is sufficient evidence to support the finding that Isaac exercised a "supervisory role": the building's new tenant testified that Isaac acted as Marvin's "right-hand man"; Isaac accompanied a private environmental consultant through the property; and Isaac spoke with DEP officials to account for the asbestos removal. Sentencing Guideline Section 3B1.1 was applicable to both defendants.

█ Second, defendants object to the six-level enhancement pursuant to Sen-

---

**1.** Although we review the district court's Guidelines determination in this case, we do not suggest that every panel of this Court confronted with post-*Booker* sentencing issues must first decide the district court's Guidelines determination prior to remanding for resentencing consistent with *Booker* and *Cros-*

*by. See United States v. Hughes,* 396 F.3d 374, 381 n. 9 (4th Cir.2005). We likewise do not suggest that cases such as this (where there is a Guidelines error) present the only circumstances in which pre-remand Guidelines analysis is warranted.

tencing Guideline Section 2Q1.2(b)(1)(A) for "ongoing, continuous, or repetitive" discharge of asbestos. We agree with the district court that the illegal asbestos removal at 2 Prince Street was repetitive. It occurred during two separate one-week periods—first in December 2000, and again in February 2001—on multiple floors of the building. There was sufficient evidence of this conduct to support the six-level enhancement.

■ Finally, defendants challenge the four-level enhancement for permitless transportation of a hazardous or toxic substance pursuant to Sentencing Guideline Section 2Q1.2(b)(4). Section 2Q1.2 applies if "the offense involved transportation, treatment, storage, or disposal" of a hazardous or toxic substance "without a permit or in violation of a permit." U.S.S.G. § 2Q1.2(b)(4). In imposing this enhancement, the district court cited defendants' violation of two state regulations requiring a transporter of asbestos to have a permit and to inform landfill operators of his intent to dispose of asbestos: 6 N.Y.C.R.R. §§ 360–1.7(a)(1) ("[N]o person shall ... construct or operate a solid waste management facility, or any phase of it, except in accordance with a valid permit issued pursuant to this Part...."); and 360–2.17(p)(1) ("The transporter, having a permit pursuant to Part 364 of this Title must first inform the landfill operator of his intent to dispose of asbestos waste, the volume of the waste, and the anticipated date the shipment will arrive at the landfill.").

Defendants argue that the New York permitting requirements are inapplicable because there is no evidence that the defendants were involved in the construction or operation of a waste management facility or that they transported asbestos to a landfill. As the government indicates, this argument was not raised in the district court, so the government had no opportunity to enhance the record in this regard. In any event, the enhancement is inapplicable because the Clean Air Act offense committed by the defendants did not "involve" the violation of the New York State permit regulations. U.S.S.G. § 2Q1.2(b)(4).

This is a matter of first impression in this Circuit, but the Third Circuit decided the same issue in *United States v. Chau*, 293 F.3d 96 (3d Cir.2002). Chau, like the Rubensteins, was charged with violating the Clean Air Act. The Third Circuit ruled that Section 2Q1.2(b)(4)'s four-level enhancement is inapplicable unless the offense charged "involve[d]" a permit violation; consulted the dictionary definition of "involve" ("'to relate to closely: [to] connect' and 'to have within or as part of itself: [to] include,'"); concluded that the city permit involved in Chau's offense was not "integral" to his Clean Air Act violation; and held that "[b]ecause the Clean Air Act does not contemplate a permit violation as a basis of enforcement, the Section 2Q1.2(b)(4) enhancement is not available." *Id.* at 102 (citations omitted).

The government argues that the Third Circuit erroneously adds to Section 2Q1.2(b)(4) a requirement that the permit be part of the federal enforcement regime and thus "ignore[s] the inter-relationship between federal, state and local environmental agencies in New York and elsewhere." We disagree. The wording of Section 2Q1.2 requires that the "offense involve[ ]" activity in violation of a permit. The Clean Air Act—in contrast to several other federal environmental statutes that contain an express federal permit requirement[2] or delegate the permitting function

2. *See, e.g.,* 43 U.S.C. § 1350(c) (imposing criminal liability for violating a permit issued

to the states [3]—expressly does not require a permit for the disposal of asbestos. *See* 40 C.F.R. § 70.3(b)(4) (exempting asbestos from a permit requirement); *see also* 57 Fed.Reg. 32250, 32263 (1992) ("The burden imposed by requiring permits for asbestos demolition and renovation sources is unnecessary because it would provide few additional environmental or enforcement benefits."). The Rubensteins' offense—violation of the Clean Air Act—therefore did not "involve" a permit violation. The district court erred by considering state permitting requirements—that are arguably inapplicable to defendants—in imposing this enhancement.

Having undertaken review of the guidelines question, which is significant and which can have ramifications in other cases, and having decided that the guidelines application was erroneous, we vacate the sentences because we think that the influence of this error is likely to be so pronounced that it could cause resentencing after remand to be unreasonable.

### Conclusion

For the foregoing reasons, we affirm defendants' convictions and remand to the district court with instructions to vacate defendants' sentences, and conduct resentencing consistent with this opinion and *United States v. Booker*, — U.S. —, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and not inconsistent with *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005).

CARDAMONE, Circuit Judge, Concurring:

I agree with the result and reasoning in this case, with one possible exception stated below. I write separately because I believe it important to highlight the fact that our decision to vacate the sentence in this case should not be taken as precedent automatically to vacate all incorrectly calculated Guidelines sentences in the future.

In the wake of *United States v. Booker*, — U.S. —, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), we remand sentences imposed under the prior mandatory Guidelines regime to allow the district court to consider whether, in light of its newly minted discretion to impose a non-Guidelines sentence, it wishes to resentence, thus curing the Sixth Amendment violation identified in *Booker*. *See United States v. Crosby*, 397 F.3d 103, 117–18 (2d Cir.2005). As we state in our opinion, we exercise discretion in these transitional cases to consider the propriety of the district court's original Guidelines calculation before remanding, and, in circumstances such as those here, to vacate an erroneous Guidelines sentence. Of course, since *Booker* requires all sentences from this point forward to be reviewed for "reasonableness," 125 S.Ct. at 765, our decision to vacate an erroneous Guidelines sentence does *not* mean that if the district court, on remand, imposes a correct Guidelines sentence, we would necessarily find that sentence reasonable upon subsequent review. Correct application of the Guidelines is but one factor to be considered under 18 U.S.C. § 3553 in reviewing reasonableness, *see Booker*, 125 S.Ct. at 766 (stating that the factors in 18 U.S.C. § 3553 "will guide appellate courts . . . in determining whether a sentence is

---

under chapter governing submerged lands near continental shelf); 7 U.S.C. § 136j (making it unlawful to exceed the "experimental use permit" issued by the EPA for a pesticide).

**3.** *See* 33 U.S.C. § 1319(c)(1) & (2) (prohibiting negligent and knowing violation of any effluent limitation or condition of a pollutant discharge permit issued pursuant to 33 U.S.C. § 1342, which creates a permitting scheme administered by the EPA or the states if approved by the EPA).

unreasonable"), and it is entirely possible that a correctly calculated Guidelines sentence might nonetheless be found unreasonable upon consideration of other factors.

By the same token, an incorrectly calculated Guidelines sentence might nonetheless be reasonable. I thus think it necessary to clarify our statement that "because the Guidelines error non-trivially affected the Guidelines sentence imposed *as a mandate*, vacatur of the sentence is necessary without reference to *Blakely[ v. Washington,* — U.S. —, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)] or *Booker* or the principles of re-sentencing set out in *Crosby*." Majority op. *supra* (emphasis added). I do not agree with the majority that vacatur is "necessary" rather than discretionary, and I likewise do not agree that our decision to vacate is unrelated to our obligations under *Booker* and *Crosby*; indeed, we go on (correctly) to state that we vacate "*because* we think [the error is] so pronounced that it could cause a resentencing after remand to be unreasonable." Majority op. *supra* (emphasis added).

In any event, we confine our statement regarding vacatur to pre-*Booker* sentences imposed as a mandate. We will soon be faced with a growing number of post-*Booker* sentences, including those that return to us after a *Crosby* remand. Those sentences will be reviewed for reasonableness, and because an incorrectly calculated Guidelines sentence might nonetheless be reasonable, vacatur of a sentence based on Guidelines errors would not automatically be warranted.