09-5204-cr
USA v. Skys

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2010

(Submitted: November 17, 2010    Decided: February 23, 2011)

Docket No. 09-5204-cr

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

ERIC SKYS,

Defendant-Appellant.

_____

Before: JACOBS, Chief Judge, KEARSE and STRAUB, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York, William H. Pauley III, Judge, convicting defendant of securities fraud, 15 U.S.C. §§ 78j(b) and 78ff, and wire and bank frauds, 18 U.S.C. §§ 1343, 1344, and 2, and sentencing him principally to 130 months' imprisonment as the organizer or leader of extensive criminal activity involving 10 or more victims.

Remanded for further proceedings in connection with sentencing.

PREET BHARARA, United States Attorney for the Southern District of New York, New York, New York (William J. Stellmach, Daniel A. Braun, Assistant United States Attorneys, New York, New York, of counsel), for Appellee.

IRA D. LONDON, New York, New York (London & Robin, New York, New York, of counsel), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Eric Skys appeals from a judgment entered in the United States District Court for the Southern District of New York following his plea of guilty before William H. Pauley III, Judge, convicting him on one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff; three counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and one count of bank fraud in violation of 18 U.S.C. §§ 1344 and 2. Skys was sentenced principally to 130 months' imprisonment, to be followed by a five-year term of supervised release. On appeal, he challenges two aspects of the district court's calculation of the range of imprisonment recommended by the advisory Sentencing Guidelines ("Guidelines"), contending that the district court erred (1) in finding that there were 10 or more victims of his offenses within the meaning of Guidelines § 2B1.1(b)(2), and (2) in finding that he was the organizer or leader of criminal activity that was extensive within the meaning of Guidelines § 3B1.1(a). For the reasons that follow, we conclude that the district court's findings on these issues are insufficient to permit meaningful review, and we remand for supplementation of the record with appropriate findings or for resentencing.

## I.  BACKGROUND

The events that gave rise to the present prosecution are no longer in dispute.  On the third day of his trial on the above charges, Skys elected to withdraw his plea of not guilty and to plead guilty on all counts, stating, _inter alia_, "I am guilty and the evidence is overwhelming" (Trial Transcript, August 5, 2009, at 377).

### A.  The Events Underlying the Counts of Conviction

In August 2007, Skys, whose real name is Eric Smith, launched a scheme to obtain large sums of money from several financial institutions.  He held himself out to be the president and chief executive officer of a company he called Kaiser-Himmel Corp. ("Kaiser-Himmel" or "K-H"), which was supposedly in the business of providing information technology consulting services. He approached Citigroup Inc. ("Citigroup") and represented that Kaiser-Himmel owned approximately 13.4 million shares of stock in Sprint Nextel Corp. ("Sprint") that K-H had received as payment for an anti-virus computer program called "Aedan," which K-H had supposedly developed and which involved the use of artificial intelligence.  At that time, the market value of 13.4 million shares of Sprint was approximately $240 million.  Skys represented that K-H's Sprint shares were restricted, _i.e._, they could not legally be transferred until October 2008, and he sought to realize immediate cash for about one-third of the shares by a

means such as pledging them to Citigroup in exchange for a loan-- or an advance purchase price--of $83 million that would be repaid either in cash or by transferring the hypothecated shares. In fact, neither Skys nor K-H owned any Sprint stock, and all of the documents that Skys submitted to Citigroup as evidence of ownership were fabricated.

Citigroup seriously considered the proposed transaction but declined in October 2007, after it contacted Sprint and learned that Skys's claims were false and his documents were forgeries. Skys made similar attempts to obtain funds from three other financial institutions, using some of the same forged documents. Those attempts also failed.

Skys was arrested in May 2008 and charged with one count of securities fraud and one count of bank fraud in connection with his fraudulent offers to sell the Sprint shares to the financial institutions, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 18 U.S.C. §§ 1344 and 2, and three counts of wire fraud in connection with interstate telephone or fax communications to Citigroup with respect to, inter alia, securities accounts with fraudulently stated balances, in violation of 18 U.S.C. §§ 1343 and 2. As indicated above, Skys entered a mid-trial plea of guilty on all counts.

B. Uncharged Conduct

The presentence report ("PSR") prepared on Skys described the following additional fraudulent conduct in which Skys had

- 4 -

engaged but which was not charged in the present case. From January 2006 through March 2007, Skys solicited investments in a company he called Backspace2--a predecessor of Kaiser-Himmel--representing that he had become a multimillionaire by developing the "Aedan" anti-virus program and that he had existing contractual relationships with several large corporations and the United States Department of Defense. In support of these solicitations, Skys distributed documents that were fabrications or forgeries. The PSR stated that these solicitations were successful and that Skys defrauded investors of moneys; but it did not identify any such investor, did not state how many investors there were, and did not state the amounts of which they were defrauded.

In addition, the PSR described Skys's receipt of $300,000 from a Florida dentist in 2008 in exchange for a false promise to develop dental imaging software. Skys's sales pitch had included representations as to his ownership of 13.4 million shares of Sprint stock. Skys also solicited, unsuccessfully, a $2 million investment from the dentist, promising to repay him $5 million in the fall of 2008 when Skys would be permitted to sell the Sprint shares.

The PSR characterized the dentist and the Backspace2 investors as victims in Skys's offenses but noted that his conduct with respect to those persons was uncharged.

C. Sentencing

The PSR's calculation of Skys's advisory-Guidelines offense level began with a base offense level of 7 pursuant to § 2B1.1(a)(1); it recommended increases for the following specific offense characteristics: 24 steps pursuant to § 2B1.1(b)(1)(M) for an intended loss amount of more than $50 million but not more than $100 million; two steps pursuant to § 2B1.1(b)(2)(A) for an offense involving 10 or more, but fewer than 50, victims; and two steps pursuant to § 2B1.1(b)(9)(C) for an offense that involved sophisticated means. The PSR also recommended a four-step upward adjustment pursuant to § 3B1.1(a) on the ground that Skys was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, and a two-step downward adjustment pursuant to § 3E1.1(a) for Skys's acceptance of responsibility prior to the imposition of sentence.

The total offense level was 37. Given Skys's criminal history category of II, the Guidelines-recommended range of imprisonment was 235 to 293 months. The PSR nonetheless recommended a prison term of 120 months as sufficient, given, principally, that Skys had a history of emotional disturbance and had actually obtained no money from the financial institutions.

Skys submitted to the district court a presentence memorandum objecting to the PSR-recommended enhancement for 10-49 victims and the recommended adjustment for a leadership role in criminal activity involving five or more participants. He argued principally that the government had not sufficiently identified

such victims or participants. Responding to the 10-victim-enhancement objection, the government argued that the total number of financial institutions that Skys had attempted to defraud, plus the Florida dentist and the Backspace2 investors he had succeeded in defrauding, was more than 10, and indeed approached 50. As to the role adjustment, the government argued that there were in fact at least five participants in Skys's criminal activity: (1) Skys himself; (2) his life partner Coreen Cunningham who, as the corporate secretary of Kaiser-Himmel, made material misrepresentations to Skys targets; (3) K-H's supposed chief financial officer Joseph Cross; (4) Michael Breshears, who, along with Cross, had acted as a middleman in assisting Skys's attempts to obtain financing from the financial institutions; and (5) Gary Griffiths, self-described as a collaborator in the supposed development of "Aedan," who had helped recruit individual investors for Backspace2. The government also argued that Skys's scheme, given its nature and his repeated misrepresentations and fabrications, was sufficiently extensive to warrant the role adjustment.

Skys pursued his objections to the 10-victim enhancement and the leadership-role adjustment at the sentencing hearing. He argued, inter alia, that the Backspace2 investors should not be considered victims of his offense because that scheme was not part of the same enterprise as his offense conduct. He argued that the role adjustment was inappropriate because Cunningham could not be a criminally responsible participant, as "[s]he believed what Mr.

Skys told her," and there was "no evidence that [she] knew" anything she did for Kaiser-Himmel "was fraudulent," and that the other individuals named by the government were "merely doing their jobs" and could not legitimately be considered coconspirators. (Sentencing Transcript, December 3, 2009 ("S.Tr."), at 9.) Skys claimed that the scheme did not meet the "otherwise extensive" branch of the leadership role guideline because he conducted the fraud "alone through just e-mails." (Id. at 10.)

In sentencing Skys, the district court stated that (except in certain respects not pertinent to this appeal) "this Court has reviewed the presentence report. I adopt the findings of fact in the report . . . . as my own." (Id. at 20.) In rejecting Skys's 10-victim objection, the court stated as follows:

> [C]onsidering the continuity with relevant conduct and the financial institutions involved, I find that the probation's calculation of the two-level enhancement for more than ten victims is warranted.

(Id. at 21.)

With respect to the role adjustment, the court had noted that § 3B1.1(a) has "two disjunctive" branches, one requiring five or more participants and the other requiring criminal activity that was otherwise extensive. (S.Tr. 9.) The court commented that Skys "really didn't need five or more people. He had Ms. Cunningham and then he had the unwitting participation of other people at these various financial institutions." (Id. at 10.) "He did it from his home over a period of time in a number of calculated and orchestrated moves. And he was so good at it that he was capable of convincing other people that his

enterprise was a legitimate one. How is that not extensive?" (Id.) In formally ruling on Skys's challenge, the court stated as follows:

> Now the defendant objects to the four-level enhancement for being an organizer or leader of activity involving five or more participants or that was otherwise extensive, and this Court finds that this was an extensive scheme. Mr. Skys led a life that was entirely a life of fraud, and whenever he needed to offer another artifice, he did it, whether it was a forged stock certificate, a bogus account statement, a manipulation of e-mails. Whatever it took, the defendant rose to the occasion. It was not a momentary lapse. It was extensive. And Mr. Skys was constantly moving on to new targets of opportunity. And so a four-level enhancement is warranted in this case.

(Id. at 21-22.)

The court concluded that Skys's Guidelines-recommended range of imprisonment was 235 to 293 months. However, noting that Skys had not succeeded in his scheme to defraud the financial institutions, and finding that he was only 26 years of age and possessed the ability to become a productive member of society, the court imposed a below-Guidelines prison term of 130 months.

This appeal followed.


II. DISCUSSION


On appeal, Skys challenges the district court's application of the 10-victim and leadership-role offense-level increases as part of the Guidelines calculations. We have difficulty with both increases.

- 9 -

## A. The Standards of Review

The district court has discretion to impose either a Guidelines sentence or a non-Guidelines sentence, see, e.g., United States v. Booker, 543 U.S. 220, 243-45 (2005); but the court must "begin all sentencing proceedings by correctly calculating the applicable Guidelines range," Gall v. United States, 552 U.S. 38, 49 (2007); see, e.g., Booker, 543 U.S. at 259-60. We review the district court's sentencing decision for "reasonableness," which is essentially review for abuse of discretion. See, e.g., Gall, 552 U.S. at 46; United States v. Brown, 514 F.3d 256, 264 (2d Cir. 2008).

In determining whether there was an abuse of discretion, we review "for an error of law, or clearly erroneous findings of fact, or a decision that cannot be located within the range of permissible decisions." United States v. Josephberg, 562 F.3d 478, 502 (2d Cir.), cert. denied, 130 S. Ct. 397 (2009); see, e.g., United States v. Abiodun, 536 F.3d 162, 166 (2d Cir.) ("Abiodun"), cert. denied, 129 S. Ct. 589 (2008). Rulings of law are reviewed de novo; findings of fact are reviewed for clear error. See, e.g., id.; United States v. Rubenstein, 403 F.3d 93, 99 (2d Cir.) ("Rubenstein"), cert. denied, 546 U.S. 876 (2005). "[M]ixed questions of law and fact" are reviewed "either de novo or under the clearly erroneous standard[,] depending on whether the question is predominantly legal or [predominantly] factual." United States v. Thorn, 446 F.3d 378, 387 (2d Cir. 2006).

"[T]he interpretation of a sentencing guideline is a question of law," United States v. Carr, 557 F.3d 93, 103 (2d Cir.) (internal quotation marks omitted), cert. denied, 130 S. Ct. 169 (2009), and "[r]egardless of whether the sentence imposed is inside or outside the Guidelines range, [we] . . . . must first ensure that the district court committed no significant procedural error, such as . . . improperly calculating[] the Guidelines range . . . or failing to adequately explain the chosen sentence," Gall, 552 U.S. at 51.

As to disputed issues of fact, the district court must make findings with sufficient clarity to permit meaningful appellate review. See, e.g., United States v. Ahders, 622 F.3d 115, 119, 122 (2d Cir. 2010); United States v. Ware, 577 F.3d 442, 451-52 (2d Cir. 2009) ("Ware"), cert. denied, 131 S. Ct. 432 (2010); United States v. Cavera, 550 F.3d 180, 193 (2d Cir. 2008) (en banc), cert. denied, 129 S. Ct. 2735 (2009); United States v. Carter, 489 F.3d 528, 538 (2d Cir. 2007) ("Carter"), cert. denied, 128 S. Ct. 1066 (2008). A defendant's role in criminal activity is a question of fact, see, e.g., Ware, 577 F.3d at 452; Carter, 489 F.3d at 538. The number of persons or entities who are victims within the meaning of Guidelines § 2B1.1(b)(2) is likewise a question of fact; but the matter of who can properly be considered a victim within the meaning of that guideline is a question of law. See, e.g., Abiodun, 536 F.3d at 169.

B.  The 10-Victim Enhancement

Skys challenges the 10-victim enhancement on the ground that neither the four financial institutions that avoided being defrauded into accepting his proposed multi-million-dollar transaction nor the individuals who actually were defrauded into giving him money could properly be considered victims within the meaning of § 2B1.1(b)(2).  That section instructs the sentencing court, in pertinent part, as follows:

(Apply the greatest)  If the offense--

    (A) (i) involved 10 or more victims . . . . ,
    increase by 2 levels;

    (B) involved 50 or more victims, increase
    by 4 levels . . . .

Guidelines §§ 2B1.1(b)(2)(A)(i) and (B).  The commentary to § 2B1.1 defines "[v]ictim," in pertinent part, as "any person [including individuals, corporations, and companies] who sustained any part of the actual loss determined under subsection (b)(1)." Guidelines § 2B1.1 Application Note 1 (emphasis added).

Subsection (b)(1) of § 2B1.1 is the loss table that prescribes offense-level increases depending on the amount of loss.  The commentary focusing on subsection (b)(1) provides, with exceptions not relevant here, that "loss is the greater of actual loss or intended loss," Guidelines § 2B1.1 Application Note 3(A) (emphasis added).  It defines "[i]ntended loss" as "the pecuniary harm that was intended to result from the offense," id. Application Note 3(A)(ii) (emphasis added), and defines "[a]ctual loss" to "mean[] the reasonably foreseeable pecuniary harm that

- 12 -

resulted from the offense," id. Application Note 3(A)(i) (emphasis added). To determine which "is the greater," actual loss or intended loss, the court obviously must make some determination as to the amount in each category; but it "need only make a reasonable estimate of the loss," id. Application Note 3(C).

In sum, while the court's loss determination under subsection (b)(1) of § 2B1.1 is to be based on the amount of intended loss if that is greater than the amount of actual loss, "victims," within the meaning of subsection (b)(2), are only those persons or entities who sustained "actual loss determined" by the court "under subsection (b)(1)." See, e.g., Abiodun, 536 F.3d at 169 (error as a matter of law to include as victims individuals whose "losses . . . were not included in the loss calculation").

Skys, noting the above definition of "[v]ictim," points out that

> [a]lthough the testimony adduced at trial could support a claim that the financial institutions bore some incidental, actual loss, that loss was not part of the § 2B1.1(b)(1) calculation. The purported incidental losses therefore cannot form the basis for a finding that the financial institutions were victims. . . . Moreover, if the court took lost time into account when it decided that the financial institutions were victims, it failed to determine the monetary value of this time when making its calculations of loss, as this section also requires.

(Skys brief on appeal at 27 (emphases added).) We agree. The court's loss calculation under subsection (b)(1) was based on intended loss:

> [T]he defendant admitted he attempted to deceive financial institutions by making fraudulent misrepresentations to them that he was in possession of more than 13 million shares of Sprint-Nextel

- 13 -

> stock. He made these representations in *an effort* to obtain $83 million from financial institutions in the United States.
>
> Now this Court has reviewed the presentence report. I adopt the findings of fact in the report as amended here on the record as my own.
>
> Turning first to the guideline calculation, because this crime sounds in fraud, the base offense level is 7, and because the offense involved an *anticipated* loss exceeding 50 million but less than a hundred million, 24 levels are added.

(S.Tr. 20-21 (emphases added).)

The district court itself made no determination that any of the four financial institutions mentioned in the PSR suffered any actual loss. And although the court permissibly adopted the findings made in the PSR, that report, while stating that the financial institutions had used their resources for several months in evaluating Skys's proposed transaction, stated that there was no determined loss amount to the institutions.

Without any determined amount of actual loss to the financial institutions, the district court inappropriately included the institutions as victims under § 2B1.1(b)(2). We agree with Skys that it is unclear how nonapplication of the two-step 10-victim increase might have affected the district court's ultimate decision on sentencing (see Skys brief on appeal at 27-28), and we thus agree with his contention that we should

> remand for the district court to determine (1) whether the record affords enough information for the court to recalculate the loss amount to include incidental losses; and, if so, (2) whether the new loss calculation would support a finding that there were ten or more victims to the offense. See Abiodun, 536 F.3d at 169.

(Skys brief on appeal at 28.)

Similar determinations are required with respect to the individual investors in Backspace2, who plainly must have been included in the district court's conclusion that there were 10 or more victims, given that the record indicates only four targeted financial institutions. The district court included these individuals because it viewed Skys's frauds against them as "relevant conduct." (S.Tr. 21.) Skys concedes that "[t]he record shows that several individuals gave money to Skys" and thereby "lost their money." (Skys brief on appeal at 25.) But he contends that their inclusion as victims of his offenses of conviction was error (1) because the individuals "were not victims of the instant offense, but rather victims of uncharged conduct," and (2) because "the losses they sustained were not included in the court's loss calculation under § 2B1.1(b)(1)." (Skys brief on appeal at 26.)

Skys's objection to consideration of the frauds perpetrated against the individuals as relevant conduct is meritless. The number-of-victims enhancement is provided for in § 2B1.1(b)'s listing of "Specific Offense Characteristics" of property crimes such as fraud. Guideline § 1B1.3, which requires the sentencing court to take into account a defendant's "Relevant Conduct" in calculating his Guidelines range, provides, in pertinent part, that "specific offense characteristics . . . shall be determined on the basis of," inter alia, "all acts . . . committed . . . by the defendant" and "all acts . . . that were

- 15 -

part of the same course of conduct or common scheme or plan as the offense of conviction." Guidelines § 1B1.3(a)(1)(A) and (2) (emphases added). Indicia of a common scheme or plan include the use of the same or a similar "modus operandi." Guidelines § 1B1.3 Application Note 9(A). We see no indication that the district court misinterpreted these provisions.

Nor do we see any clear error in the district court's finding that Skys's defrauding of the investors was relevant conduct. The record reflects, inter alia, that Skys represented that Backspace2 and Kaiser-Himmel (into which Backspace2 was merged) were computer technology companies; that major aspects of Skys's solicitations of both the Backspace2 investors and the financial institutions included misrepresentations that Skys or his company had developed the "Aedan" anti-virus computer program and as a result had won lucrative contracts with major corporations; and that Skys presented both targeted groups with forged and fabricated documents. Plainly, Skys's fraudulent conduct against both groups used the same or a similar modus operandi, and his frauds against the Backspace2 investors were properly considered relevant conduct.

Skys's objection on the ground that the actual losses suffered by the individuals were not determined as part of a subsection (b)(1) determination of actual loss, however, has merit. The district court implicitly found--and Skys admitted--at the sentencing hearing that the individual Backspace2 investors had suffered actual losses:

THE COURT: . . . [T]hey were defrauded, right? There's no question--

MS. HELLER [Skys's attorney]: Well, they lost money.

THE COURT: There's no question they were defrauded, is there?

MS. HELLER: No, your Honor, there is not.

(S.Tr. 11.) But, the court made no determination or estimate as to the amounts lost by the defrauded Backspace2 investors, either individually or as a group.

Nor did the PSR--which noted the $300,000 loss of a single individual, the Florida dentist--make any determination as to the amounts lost by the Backspace2 investors. Rather, given the magnitude of the $83 million intended loss, to which Skys allocuted, it appears that the PSR and the district court, for purposes of identifying the proper step on the subsection (b)(1) loss table, simply assumed--no doubt correctly--that the defrauded individuals' actual losses totaled less than $83 million. But that assumption did not suffice to permit the court to consider the defrauded individuals to be victims within the meaning of § 2B1.1(b)(2), given the definition of victims as those who sustained any part of the actual loss "determined" under subsection (b)(1).

Further, neither the PSR nor the court made any finding as to the number of Backspace2 investors defrauded by Skys. The absence of any finding as to how many such investors there were, and as to the basis for any quantification, forecloses meaningful review of the application of the 10-victim enhancement.

In sum, the court did not determine the amount of actual losses suffered by the four financial institutions--or even whether they suffered actual losses at all; as to the individual Backspace2 investors--who Skys concedes suffered actual losses-- the court did not make any estimate or determination of the amount of those losses; and the court did not make any finding as to how many such actually defrauded investors there were.

Accordingly, the district court's findings were insufficient to support the 10-victim enhancement under subsection (b)(2) and insufficient to permit meaningful appellate review. We remand for further proceedings to permit the court to supplement the record with such findings as are appropriate as to (a) whether and to what extent the financial institutions targeted by Skys suffered actual losses, (b) the amounts of loss suffered by individuals defrauded by Skys as part of this common scheme or plan, and (c) the total number of persons who suffered such actual losses. If the court concludes that there were fewer than 10 such victims, the court must recalculate Skys's Guidelines- recommended range of imprisonment without the victim enhancement.

C. The Role Adjustment

The Guidelines provide for a four-step increase in offense level if the defendant was "an organizer or leader of a criminal activity that" either "involved five or more participants or was otherwise extensive." Guidelines § 3B1.1(a) (emphasis added). "Organizers or leaders of non-extensive criminal activities are

- 18 -

subject only to the two-level enhancement of Guidelines § 3B1.1(c)." United States v. Carrozzella, 105 F.3d 796, 802 (2d Cir. 1997) ("Carrozzella"), abrogated in part on other grounds by United States v. Kennedy, 233 F.3d 157, 160-61 (2d Cir. 2000). For any part of § 3B1.1 to apply there must have been "more than one participant." Guidelines Chapter 3, Part B - Role in the Offense, Introductory Commentary; see, e.g., id. § 3B1.1 Application Note 2 ("To qualify for an adjustment under this section, the defendant must have" supervised or led at least one "other participant[]."); United States v. Garcia, 413 F.3d 201, 223-24 (2d Cir. 2005) (discussing § 3B1.1(c)), cert. denied, 552 U.S. 1154 (2008); United States v. Zichettello, 208 F.3d 72, 107 (2d Cir. 2000) (discussing § 3B1.1(a)), cert. denied, 531 U.S. 1143 (2001). A "participant," for purposes of § 3B1.1, is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." Guidelines § 3B1.1 Application Note 1; see, e.g., Ware, 577 F.3d at 453.

In the present case, the district court applied only the "otherwise extensive" branch of § 3B1.1(a), stating that "this Court finds that this was an extensive scheme" (S.Tr. 21; see also id. at 9-10 (Skys "really didn't need five or more people. He had Ms. Cunningham and then he had the unwitting participation of other people at these various financial institutions.")). Skys contends that § 3B1.1 is not applicable at all, arguing that the district court did not find that there was any "criminally responsible participant" other than Skys himself (Skys brief on

appeal at 30-31); and he contends that the court gave no adequate explanation for its determination that Skys's activity was "extensive" within the meaning of subsection (a) (id. at 31-33). We agree that the district court's findings and explanation were inadequate.

"Before imposing a role adjustment, the sentencing court must make specific findings as to why a particular subsection of [the] § 3B1.1 adjustment applies." Ware, 577 F.3d at 451; see, e.g., United States v. Espinoza, 514 F.3d 209, 212 (2d Cir.) ("Our precedents are uniform in requiring a district court to make specific factual findings to support a sentence enhancement under [Guidelines] § 3B1.1." (internal quotation marks omitted)), cert. denied, 553 U.S. 1045 (2008); United States v. Patasnik, 89 F.3d 63, 69 (2d Cir. 1996) ("[A]n implicit finding is not enough."); Carter, 489 F.3d at 538 ("Although this requirement of making specific factual findings may interfere with the smooth operation of the sentencing hearing, we require specific factual findings to permit meaningful appellate review." (internal quotation marks omitted)).

To be "sufficiently specific to permit meaningful appellate review[, i]t is not enough for the court merely to repeat or paraphrase the language of the guideline and say conclusorily that the defendant meets those criteria." Ware, 577 F.3d at 452. And "although a sentencing court may sometimes satisfy its obligation to make findings by adopting the factual statements in the defendant's presentence report . . . , adoption

of the PSR does not suffice if the PSR itself does not state enough facts to permit meaningful appellate review." Id.; see, e.g., Carter, 489 F.3d at 538-39.

With respect to the extensiveness branch of § 3B1.1(a), the Guidelines commentary states that

> [i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

Guidelines § 3B1.1 Application Note 3 (emphases added). Further, as noted in Carrozzella,

> the background commentary states that the adjustments in Guidelines § 3B1.1 are "based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense." Guidelines § 3B1.1 Background. This commentary and our decision in [United States v. ]Liebman, [40 F.3d 544 (2d Cir. 1994)] indicate that an adjustment under Guidelines § 3B1.1 is based primarily on the number of people involved, criminally and noncriminally, rather than on other possible indices of the extensiveness of the activity. . . .
>
> . . . . .
>
> . . . . At the very least, Section 3B1.1's 'otherwise extensive' prong demands a showing that an activity is the functional equivalent of an activity involving five or more participants.

Carrozzella, 105 F.3d at 802, 803 (first emphasis ours, second emphasis in original) (other internal quotation marks omitted).

Thus, this branch of § 3B1.1(a) is "not so much about extensiveness in a colloquial sense as about the size of the organization in terms of persons involved that a defendant

'organize[d]' or 'le[d].'" Carrozzella, 105 F.3d at 803. Accordingly, we have stated that

> [t]hree factors determine whether an activity [wa]s "otherwise extensive": "(i) _the number of knowing participants_; (ii) _the number of unknowing participants_ whose activities were organized or led by the defendant with specific criminal intent; [and] (iii) _the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme_."

Rubenstein, 403 F.3d at 99 (quoting Carrozzella, 105 F.3d at 803-04 (emphases ours)).

The role-adjustment findings made in the present case do not meet the above standards. First, in order for either branch of § 3B1.1(a) to be applicable, there must have been, as discussed above, at least one person, in addition to Skys, who was a "participant," _i.e._, a person who, although perhaps not convicted, is criminally responsible for the commission of the offense. The district court stated that "[Skys] had Ms. Cunningham and then he had the unwitting participation of other people at these various financial institutions" (S.Tr. 10); but while the statement that Skys "had" Cunningham is sufficient to indicate that Cunningham provided Skys with services, it is not a finding that Cunningham acted with knowledge that her conduct was criminal. Nor did the court make such a finding as to any other individual. The court's reference to the persons at the various financial institutions as "unwitting" (_id._) tends to negative any implication that any of those persons could properly be deemed criminally responsible. Without a finding identifying at least one person other than Skys who was criminally responsible, the § 3B1.1(a) role adjustment was

- 22 -

inappropriate. Given that, as to wire and bank fraud, Skys was convicted not only under 18 U.S.C. §§ 1343 and 1344 but also under 18 U.S.C. § 2, it would be surprising if there were not another criminally responsible person. But without an informative finding by the district court, no meaningful review is possible.

Second, the court gave no objectively reviewable explanation for its characterization of Skys's criminal activity as extensive. Although the government, as described in Part I.C. above, had named four individuals (other than Skys) whom it viewed as criminally responsible participants, the district court made no finding as to any of those individuals, nor any finding that there was a significant number of persons who were culpable. And although the government contended that the number of Backspace2 investors plus the Florida dentist and the financial institutions totaled nearly 50 victims targeted by Skys, the court made no finding as to that contention either--even assuming that such a finding would not constitute an impermissible overlap with an appropriate number-of-victims enhancement, see Carrozzella, 105 F.3d at 802-03. Nor did the court make a finding, as contemplated by § 3B1.1 Application Note 3, that quantified the persons who were "involved" during the course of Skys's offense, or a finding that "many" people--or indeed anyone other than Cunningham--had provided Skys with "services." Instead, the court found that

> Mr. Skys led a life that was entirely a life of fraud, and whenever he needed to offer another artifice, he did it, whether it was a forged stock certificate, a bogus account statement, a manipulation of e-mails. Whatever it took, the defendant rose to the occasion. It was not a

momentary lapse. It was extensive. And Mr. Skys was <u>constantly moving on to new targets of opportunity</u>. And so a four-level enhancement is warranted in this case.

(S.Tr. 21-22 (emphases added).) Statements that Skys led "entirely a life of fraud" and was "constantly" seeking new victims indicate repeated criminal conduct, but do not constitute findings of extensiveness except in a temporal or a colloquial sense. And those statements, like the statements that Skys did "[w]hatever" was required "whenever" a fabrication was needed, are not findings of fact that are susceptible to any meaningful appellate review. They are conclusory observations based on premises that the court did not articulate.

Accordingly, we remand to permit the district court to supplement the record with appropriate factual findings as to why the criteria for application of the extensiveness branch of § 3B1.1(a) are met. In so remanding, we do not mean to preclude the court from making factual findings, if the record warrants, as to the involvement of four persons in addition to Skys who were criminally responsible, at least one of whom was organized or led by Skys, and therefore applying the other branch of § 3B1.1(a). If the court concludes that the criteria for neither branch are met, it must recalculate Skys's Guidelines-recommended range of imprisonment without an adjustment under that subsection, but with an adjustment under subsection (c) of § 3B1.1 if appropriate.

CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this appeal and, except as indicated above, have found them to be without merit. We remand (a) for supplementation of the record with factual findings as to victim enhancement and role adjustment in accordance with the criteria discussed above; and/or (b) if the court concludes that either set of criteria is not met, for recalculation of Skys's Guidelines-recommended range of imprisonment without the offense-level increase for which the criteria are not met, and for resentencing.

We note that Skys also contends that the adjustment on the ground that the scheme was extensive constituted impermissible double counting in light of the enhancements for loss amount, number of victims, and use of sophisticated means (see Skys brief on appeal at 34-35). Until more specific factual findings are made by the district court on remand, consideration of this contention is premature.

The mandate shall issue forthwith. If the district court supplements the record on both issues in accordance with the foregoing, this appeal will be reinstated--without the need for a new notice of appeal--upon notice by either party to this Court by letter within 14 days of such supplementation. If the district court resentences Skys, any party wishing to appeal must file a new notice of appeal. In either event, the matter shall be referred to this panel.